No. 1-14-3391

2017 IL App (1st) 143391

FOURTH DIVISION
December 21, 2017

No. 1-14-3391

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 2581 (01) |
| | ) | |
| NED JAMES, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Ned James, along with Cortez Moore, Rashawn Coleman, and Henry Sistrunk, broke into a south-side apartment around 4 o'clock in the morning on January 17, 2011. The men attacked two male occupants and bound them with duct tape; forced a female occupant, A.W., to undress at gunpoint; and herded everyone into the kitchen. While defendant, Sistrunk, and Moore ransacked the apartment in search of money or drugs—neither of which they found—Coleman stood guard over the occupants with a rifle and sexually assaulted A.W.

¶ 2    Defendant and his confederates were charged with home invasion, armed robbery with a firearm, and aggravated criminal sexual assault. Sistrunk died while awaiting trial. The other codefendants were convicted of all charges after simultaneous but severed trials—defendant and Moore by separate juries, and Coleman before the bench. Defendant was sentenced to an aggregate prison term of 90 years.

1

¶ 3 Defendant raises several issues on appeal. Briefly, he contends that: (1) the evidence was insufficient to prove him accountable for A.W.'s sexual assault; (2) the prosecutors committed misconduct during their opening statements and closing arguments; (3) the trial court erred in omitting the bracketed language in Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.06-3.07) when instructing the jury; (4) the trial court abused its sentencing discretion; (5) the statute authorizing his sentence for home invasion to be served at 85% time upon a judicial finding of great bodily harm is facially unconstitutional under *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000); (6) the trial court failed to conduct an adequate preliminary *Krankel* inquiry; and (7) his mittimus contains errors.

¶ 4 Some of these issues are identical to, and others significantly overlap with, issues raised by Moore and Coleman in their own pending appeals. See *People v. Moore*, 2017 IL App (1st) 1150208; *People v. Coleman*, 2017 IL App (1st) 1143470-U. Here, we resolve these issues only as they pertain to defendant. For the reasons we explain below, we hold that defendant is eligible for day-for-day credit on his home-invasion sentence, and we correct the mittimus as he has requested. We otherwise affirm defendant's convictions and sentences.

¶ 5                          FACTS

¶ 6 Believing they were robbing a drug house, defendant, Coleman, Moore, and Sistrunk broke into an apartment on South Wentworth Avenue in Chicago. The apartment was home to two couples and a baby: Maritza Morales, Khalil Cromwell Sr., and their eight-month-old son, Khalil Jr.; as well as A.W. and Isaac Andrews.

¶ 7    Morales, Andrews, and A.W. testified for the State, as did several responding police officers and forensics experts. None of the codefendants testified or presented any witnesses. The State's theory was that the codefendants shared a common design to rob the victims of drugs and money, and that every act or threat of force by any of them—including Coleman's sexual assault of A.W.—was an act in furtherance of that common design. The State thus proceeded on accountability theories of guilt as to all charges. The defense theory was that although defendant was admittedly in the apartment during the offenses—indeed, the police arrested him there—he did not participate in them; rather, he was visiting a known drug house when his codefendants arrived with their own criminal agenda.

¶ 8                                I. Victims' Testimony

¶ 9    Morales, Cromwell, and their baby stayed in the rear bedroom of the apartment, off the kitchen. Andrews and A.W. stayed in the front bedroom, off the living room. Morales testified that she awoke to a loud noise around 3:45 a.m. She roused Cromwell, who went to the kitchen to see what was happening. Morales peeked out of the bedroom door and saw Cromwell on the kitchen floor. Two men in masks were beating him with their fists and kicking him in the face and back.

¶ 10    Morales hid in the bedroom closet with the baby. A man wearing a "scary Halloween mask" came into the bedroom and rummaged through the drawers. Defendant's DNA was found on the mask Morales identified. After the baby made a noise, the man opened the closet door, pulled Morales and the baby into the kitchen, and told Morales to sit on the floor and stare at the wall. She glanced at Cromwell: He was lying on his stomach, with his hands, feet, and face duct-taped; and there was blood around him on the floor. The men brought Andrews and A.W. into

the kitchen and ordered them to get down on the floor. They duct-taped Andrews's hands, feet, and face. A.W. was naked.

¶ 11    Andrews and A.W. also woke up when they heard noise in the apartment. Andrews got out of bed and cracked open the bedroom door, where he was confronted by a man dressed all in black, brandishing a handgun, and wearing a "Halloween scream" mask. Andrews identified the same mask as Morales. According to Andrews, the man in the mask, and two others, who were also dressed in black, came into the bedroom. A.W. testified that she saw two men: a taller man wearing a mask; and a shorter, heavier man, who was not wearing a mask, and whom she identified as Coleman. One of the men, according to A.W., was pointing a "long wooden gun" (the exhibits depict what appears to be a rifle) at Andrews.

¶ 12    The men—however many there were—ordered Andrews to get on the floor and keep his head down. A.W. tried, unsuccessfully, to hide under the covers. The men ordered her to get out of bed, take off her clothes, and lie down on the floor with Andrews. A.W. testified that both of the men she saw—Coleman and the taller man in the mask—told her to take off her clothes. A.W. removed her bra and pajama shorts. She testified that one of the men was pointing a gun at her. Andrews testified that while A.W. was lying naked on the floor next to him, the men— Andrews could not be more specific, but he used the plural "they"—told A.W. to open her legs and said "fat as[s] pussy" or something like that.

¶ 13    The men asked where the "shit" or "white" was, and they threatened to drop a barbell on Andrews's head if he did not tell them. Andrews looked up, and one of them hit him in the face with a crowbar or tire iron. While Andrews was being attacked, A.W. was being taken to the kitchen. A.W. could not remember which of the men took her to the kitchen, but she testified that it was only one. Soon after that, Andrews was taken separately to the kitchen.

¶ 14    In the kitchen, Andrews and A.W. were told to lie down on the floor with Cromwell and Morales (who was holding Khalil Jr.). Andrews was duct-taped in the same fashion as Cromwell, and A.W. was still naked. The victims saw a total of four men, three of whom were masked: two of the masks were "Halloween" or "scream" masks of different varieties, and the third was a black ski mask. Morales, Andrews, and A.W. all identified the fourth man, whose face they said was visible, as Coleman.

¶ 15    The men repeatedly threatened to "cut" or "stab" the victims if they did not say where the money and the "stuff" or "white" was. Everyone understood the men to be asking for drugs, which the victims denied having. There was no evidence that any drugs, paraphernalia, or large sums of cash were ever found in the apartment. The men took the victims' wallets, phones, and video games instead.

¶ 16    While the others ransacked the apartment, Coleman stood guard over the victims in the kitchen with a rifle. A.W. testified that Coleman, whose voice she recognized, hovered over her while she was lying on her stomach. He smacked or grabbed her buttocks, and put his fingers into her vagina. A.W. testified that no one else touched her, but she acknowledged that, in her handwritten statement, she had previously said that "the biggest man"—who, she said, was not Coleman—had grabbed her buttocks before Coleman walked over and digitally penetrated her several times.

¶ 17    Andrews testified that he saw one of the men bend over A.W. in the kitchen, but he could not see which man it was or what he was doing. He heard the man tell A.W. to spread her legs and say, "[t]hat's a big old fat pussy," or some such "little vulgar words towards her pussy." Andrews acknowledged that he did not mention this in his statement to the police.

¶ 18    Morales, who remained in the kitchen until the police arrived, did not testify that anyone touched A.W. or made vulgar comments about her.

¶ 19    Neighbors had called the police, who responded within 20 or 25 minutes of the intruders' initial entry. A.W. and Morales (along with Khalil Jr.) hid in a utility closet when they heard a police radio. Andrews testified that when the officers entered, Coleman was still in the kitchen; two of the men were in the front of the apartment, near his bedroom; and the fourth man, whom Andrews identified as defendant, ran into the bedroom adjoining the kitchen and pretended that he lived in the apartment.

¶ 20                              II. Police Officers' Testimony

¶ 21    The first-responders were Officers Buckhalter and Randall (who testified), and Sergeant Cruz (who did not). Upon entering the apartment, Randall and Cruz went to the kitchen; Buckhalter went toward Andrews's bedroom. Officer Randall testified that when he entered the kitchen, he saw a man in a mask holding a handgun and kicking one of the male victims. At Randall's command, the man—Coleman—took off the mask. He put the gun inside the mask, tossed those items into the adjoining bedroom, and was detained in the kitchen.

¶ 22    Randall ordered another man to come out of the adjoining bedroom. Defendant walked into the kitchen and was detained there. Cromwell's ring and identification card were later recovered from defendant's pocket.

¶ 23    Morales and A.W. emerged from the utility closet. A.W. hugged Officer Randall and said, "God is good."

¶ 24    Meanwhile, Officer Buckhalter had approached the front bedroom. There, she saw two men. One opened the bedroom door and said, "help, we are being robbed." The other was lurking

6

in the dark. She told the men to come out, but they slammed the door. Buckhalter did not think it was safe to enter the bedroom until reinforcements arrived. When they did, the men were gone, and the window—the only other egress in the bedroom—was open.

¶ 25    Outside, several officers had pulled up along Wentworth Avenue and in the rear alley. The building was surrounded by vacant lots, and the officers saw only two men in the vicinity: Sistrunk and Moore. At first, Sistrunk was seen hanging from a window; he was later found crawling in a vacant lot, 20 or 30 feet from the building, with severe leg injuries.

¶ 26    Officers Powell, Polonio, and Calhoun were among those who chased and apprehended Moore. They testified, in sum, that Moore came running around the building onto Wentworth Avenue, headed north, turned into an empty lot, and slipped on a patch of ice. Officer Calhoun testified that Moore tossed a plastic bag while he was running; inside the bag were some number of smaller plastic bags. Calhoun's partner, Griggs, handcuffed Moore after he slipped and patted him down. Griggs removed a "scream" mask, a neck wrap, and A.W.'s wallet from Moore's front pocket. Morales, Andrews, and A.W. identified that mask as having been worn by one of the intruders.


¶ 27                                    III. Forensic Evidence

¶ 28    Several items recovered from the apartment were examined for forensic evidence by the Illinois State Police.

¶ 29    A rubber mask was recovered from the bedroom adjoining the kitchen. It contained two DNA profiles. The major profile matched defendant, and the other codefendants were excluded from the minor profile.

¶ 30    A ski mask was recovered from the same bedroom. It contained a DNA mixture from at least three people. Coleman could not be excluded from the major profile, but the other codefendants were.

¶ 31    The mask recovered from Moore's pocket contained a mixture of three DNA profiles, from which all four codefendants were excluded. Moore's DNA was found on the black neck fleece that was also recovered from his pocket.

¶ 32    Officer Buckhalter found a rifle just outside the front bedroom. A handgun was recovered from the floor of the rear bedroom, right next to the black ski mask. A knife with reddish stains was found on the kitchen floor. No latent fingerprints suitable for comparison were found on any of these items. DNA profiles found on the knife excluded all four codefendants.

¶ 33    DNA recovered from the edge of a roll of duct tape excluded all four codefendants but matched Cromwell. The DNA recovered from the crow bar or tire iron was insufficient to make a comparison.

¶ 34                         IV. Jury Deliberations and Verdicts

¶ 35    During deliberations, the jury sent three notes to the trial judge. The first requested transcripts of A.W.'s testimony. The second and third asked, "What happens if we are hung on one count/verdict," and "If we are hung on the aggravated sex assault charge, can he be tried again on that charge?" Those notes were sent during closing arguments in codefendant Moore's case, and defendant's jury returned its verdicts before the trial judge could answer them.

¶ 36    The jury found defendant guilty on five counts of home invasion (one count against each of the apartment's occupants), two counts of armed robbery (against Cromwell and A.W.), and one count of aggravated criminal sexual assault.

¶ 37    The trial court sentenced defendant to an aggregate term of 90 years in prison: an extended term of 35 years for home invasion, plus a 15-year firearm enhancement; a concurrent term of 21 years for armed robbery; and a consecutive term of 25 years for aggravated criminal sexual assault, plus a 15-year firearm enhancement. The trial judge did not make any findings of great bodily harm to the victims, but nonetheless ordered the entire aggregate term to be served at "85 percent" time.

¶ 38                                    ANALYSIS

¶ 39                                        I

¶ 40    Defendant first challenges the sufficiency of the evidence to sustain his conviction for aggravated criminal sexual assault. Since A.W. identified Coleman as the man who inserted his fingers into her vagina, the only question is whether defendant was accountable for Coleman's offense.

¶ 41    In reviewing a conviction based on a theory of accountability, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *People v. Fernandez*, 2014 IL 115527, ¶ 13; see *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact's findings on witness credibility, and the reasonable inferences to be drawn from the evidence—including inferences about a defendant's intent—are entitled to significant deference, but they are not conclusive. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *People v. Perez*, 189 Ill. 2d 254, 266-67 (2000); *People v. Calderon*, 393 Ill. App. 3d 1, 7-11 (1st Dist. 2009).

¶ 42    A person commits aggravated criminal sexual assault when he knowingly commits an act of sexual penetration by the use or threat of force, while armed with a firearm. 720 ILCS 5/12-14(a)(8) (West 2010).

¶ 43    A person is accountable for another's criminal conduct when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010). To prove that the defendant intended to promote or facilitate the crime, the State must prove beyond a reasonable doubt either: (1) that the defendant shared the principal's criminal intent; or (2) that there was a common criminal design. *Perez*, 189 Ill. 2d at 266.

¶ 44    At trial and on appeal, the State has relied on a common-design theory of accountability. Any party to a "common design or agreement" to commit an offense is accountable for any other party's "acts in the furtherance of" the design or agreement to commit that offense. 720 ILCS 5/5-2(c) (West 2010); *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 45    The State argues that Coleman's sexual assault of A.W. was an act in furtherance of a common design to rob the victims, because it was just one among many acts of violence meant to coerce them into giving up their (supposed) money and drugs. If the State's theory is right, then all of Coleman's confederates in that undisputed plan are necessarily accountable for the sexual assault, too.

¶ 46    Defendant concedes that he shared a common design with his codefendants to rob the victims, but he contends that the sexual assault was not part of, or an act in furtherance of, that design. Thus, he argues, he cannot be held accountable for Coleman's "independent" offense on a common-design theory.

¶ 47    For the reasons we will discuss below, we agree with defendant's argument but hold that defendant was properly convicted of aggravated criminal sexual assault based on a different theory of accountability than that argued by the State on appeal. While we agree with defendant that the evidence did not show that the sexual assault was in furtherance of the common design *to rob the occupants*, the evidence did show that the sexual assault was undertaken as part of a second, independent common criminal design to *sexually assault A.W.*, in which defendant actively participated. Defendant was thus properly convicted of aggravated criminal sexual assault based on accountability.

¶ 48    First, we agree with defendant that the evidence, taken in the light most favorable to the State, did not show that the sexual violence here was part of a common criminal design to rob the victims. While it was undoubtedly a criminal act, the evidence does not show that it was undertaken to further the original plan to rob the occupants.

¶ 49    No doubt, defendant and his accomplices used various methods of coercion to induce the occupants of the house to tell them where the (supposed) money and drugs were located, such as repeated threats to stab everyone or to drop a barbell on Andrews's head. And sexual violence, like any other form of violence, can certainly be used for coercive purposes. But there was no evidence that the sexual assault here was used for coercive purposes. The sexual assault was accompanied by lewd comments, but not by requests for information about the whereabouts of drugs or money or threats or warnings associated with the goals of the robbery.

¶ 50    And while we also acknowledge that stripping someone of their clothes could be used to further the commission of a robbery, to render a victim defenseless or less likely to flee, there was no evidence suggesting that the men disrobed A.W. for that reason. The men did not disrobe anyone else, nor did they sexually assault or even threaten to sexually assault anyone else.

¶ 51   There was simply no evidence that this sexual assault was part of any original plan to commit the robbery, or that it did anything to further the robbery. The evidence showed, instead, that the men's entire course of conduct with A.W.—from stripping her, forcing her to spread her legs and ogling her and making lewd comments about her genitalia, to Coleman's sexual penetration—was an act of sexual violence and degradation unrelated to any initial plan to rob the occupants.

¶ 52   But that does not mean that defendant can wash his hands of this sexual assault. It only means that the sexual violence was not part of the *original* criminal design to commit the robbery. Even if it had nothing to do with the robbery, the sexual violence was an independent crime, and defendant can be just as accountable for that crime as he can for any other offense, provided the elements of the accountability statute are met. And here, we find sufficient evidence for the jury to conclude that defendant shared a separate common criminal design with Coleman to sexually assault A.W. To paraphrase the accountability statute, "before *** the commission of" the sexual assault, "and with the intent to promote or facilitate that commission," defendant "aid[ed]" or "abet[ted]" Coleman "in the planning or commission of" that sexual assault. 720 ILCS 5/5-2(c) (West 2010).

¶ 53   Taken in the light most favorable to the State, the evidence showed that defendant played a role in the commission of the sexual assault. Coleman did not act alone in sexually assaulting A.W. It is reasonable to infer that defendant was one of the men who barged into A.W.'s bedroom. Andrews saw a total of three men in the room, though A.W. only recalled two. Andrews testified that one of those men wore a "Halloween scream" mask. Later, when the police arrived, the man in that mask ran into the other bedroom, adjoining the kitchen. When Officer Randall ordered the man to come out, defendant emerged, alone; and the mask, which

was recovered from the same room, had his DNA on it. Thus, it is reasonable to infer that defendant was the man in that mask. As for the others, A.W. identified the unmasked Coleman as one of them; and for reasons we need not delve into here, it is reasonable to infer that Moore was the third. See *Moore*, 2017 IL App (1st) 150208, ¶ 81.

¶ 54    In the bedroom, the men found A.W. hiding under the covers, wearing only a bra and pajama shorts. Two of the men brandished guns: the man who confronted Andrews at the bedroom door had a handgun, and someone else had a rifle. Some of the men dragged A.W. out of bed. She noticed one of the men pointing a gun at her, and two of the men—Coleman and a taller, masked man—ordered her to strip naked.

¶ 55    In so doing, the men in the bedroom—defendant included—initiated a course of conduct that culminated in the sexual assault of A.W. in the kitchen. Their preliminary act of forcibly undressing A.W., in particular, facilitated that offense by rendering her vulnerable to Coleman's later act of penetration. And there is no doubt that all of the men in that room contributed to the overall show of force that was used to strip A.W. naked. Thus, regardless of whether defendant actually pointed his gun at A.W., or whether he was one of the men who ordered her to undress, his conduct aided Coleman in forcibly undressing and, in turn, sexually assaulting, her.

¶ 56    That establishes defendant's act of aiding in the commission of the sexual assault. As for doing so with the requisite intent to facilitate the commission of the sexual assault, a common purpose or design sufficient for accountability may be inferred from the circumstances of a defendant's conduct. *People v. Cooper*, 194 Ill. 2d 419, 435 (2000); see *Calderon*, 393 Ill. App. 3d at 7 (intent generally proven by "inferences drawn from conduct appraised in its factual environment" (internal quotation marks omitted)). Evidence that a defendant "voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an

inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Cooper*, 194 Ill. 2d at 435. The jury could have rationally concluded that defendant, in helping forcibly strip A.W. of her clothes, did so with the common purpose of committing a sexual assault.

¶ 57 In other words, a reasonable jury could find that a spontaneous common design to sexually assault A.W. emerged in her bedroom, and that defendant was a part of it. See *id.* (common design need not be planned in advance and may emerge from "spontaneous acts of the group"). He is therefore accountable for the act, committed by Coleman, that consummated the design.

¶ 58 We do not agree with defendant's attempts to contrast this case with the decisions in *People v. Tyler*, 78 Ill. 2d 193 (1980), and *People v. Jones*, 184 Ill App. 3d 412 (1989). In *Tyler*, as in *Jones*, the defendant was accountable for a sexual assault committed by a codefendant in the course of a robbery they were committing together. *Tyler*, 78 Ill. 2d at 195-96; *Jones*, 184 Ill. App. 3d at 431-32. Neither reviewing court suggested that the sexual assault was an act in furtherance of the *robbery*; rather, the convictions were both affirmed on the ground that the defendant was aware of the sexual assault as it was happening, failed to dissociate himself from it, and indeed, assisted the codefendant by keeping a lookout. *Tyler*, 78 Ill. 2d at 197; *Jones*, 184 Ill. App. 3d at 431-32. Our holding is exactly in line with those cases, and indeed presents, if anything, a stronger case for accountability, as here, defendant played an affirmative role in assisting with the sexual assault.

¶ 59 Defendant argues that, unlike in *Tyler* and *Jones*, there was no evidence here that he was aware of the sexual assault, since he was off ransacking the apartment when it occurred. But as we have explained, it is reasonable to infer that when defendant assisted Coleman in forcibly

undressing A.W., he understood that she had been singled out as a sexual target. In this sense, defendant "knew perfectly well what was happening." See *Tyler*, 75 Ill. 2d at 197. And far from dissociating himself from the conduct that ultimately led to her sexual assault, he took an active part in it and thus facilitated the offense. In these circumstances, it is immaterial whether defendant was aware that Coleman, at that very moment, was following through on the intentions that had become evident in A.W.'s bedroom. By then, defendant had already facilitated, and was already accountable for, Coleman's offense.

¶ 60    It is of no import that the theory of accountability on which we affirm defendant's conviction is not the one the State urges on appeal. We are not bound by a party's particular argument or concession on appeal. *People v. Horrell*, 235 Ill. 2d 235, 241 (2009). We review the judgment below—the conviction for aggravated criminal sexual assault—and ask whether a properly instructed jury could have rationally found defendant guilty beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007); *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).

¶ 61    Here, the jury received IPI Criminal 4th No. 5.03, the general instruction on the law of accountability, and there is no element of our analysis that was not conveyed to the jury by that instruction. And while the State's closing argument at trial was not altogether consistent, at times suggesting that the sexual assault was an act in furtherance of the robbery, the State certainly argued to the jury, as well, that the men were accountable for Coleman's sexual assault of A.W. because they actively participated in it, noting that the men "busted into her room together. They held her up at gunpoint together. They forced her to take off her clothes together." That is precisely the evidentiary basis on which we affirm defendant's conviction for aggravated criminal sexual assault. The jury was not required to accept any particular theory of the prosecution. As long as it was properly instructed (it was), and the evidence, taken in the light

most favorable to the State, supports its verdict (it does), we will affirm that judgment. We do so here.

¶ 62                                            II

¶ 63    Defendant next contends that the prosecutors made various improper remarks in their opening statement and closing argument, and that those remarks, individually and cumulatively, deprived him of a fair trial. We consider each in turn.

¶ 64                                 A. Opening Statement

¶ 65    The prosecutor began her opening statement by telling the jury a bit about Khalil Jr. (For now, we will simply call him Khalil.) Khalil was four years old at the time of trial, and like most boys his age, he loved superheroes. Nowadays, they would come to him "though his imagination or through animation"; but when he was eight months old, "he met a couple really heroes. Real live heroes. On January 17, 2011, those real life heroes were Chicago Police Officer[s]." And "just as real as those heroes," the prosecutor continued, was the "nightmare" that Khalil and the other victims lived through. After summarizing the charged offenses, and the officers' actions upon arriving at the scene, the prosecutor informed the jury that "you will get to meet Khalil Cromwell Jr.['s] super heroes. You will hear from the police."

¶ 66    Defendant argues that these remarks were calculated to elicit unfair sympathy for Khalil and Morales, and to bolster the credibility of the testifying officers. We agree that these remarks were in certain respects improper. In light of the strong evidence of defendant's guilt, however, we are confident those limited improprieties did not affect the jury's verdicts.

¶ 67    The purpose of an opening statement is to give the jury a brief and general introduction to the factual issues in dispute and what each party expects the evidence to prove. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998); *People v. Jones*, 2016 IL App (1st) 141008, ¶ 22. The parties do not enjoy the same "wide latitude" in commenting on the case as they do in closing arguments. *Id*. Comments that are inflammatory, that are irrelevant to the question of guilt, or that tend to bolster a witness's credibility, are improper. *People v. Richmond*, 341 Ill. App. 3d 39, 47 (2003); *People v. Fluker*, 318 Ill. App. 3d 193, 203 (2000). Improper comments require a new trial only if " 'the jury could have reached a contrary verdict' " in their absence, or in other words, if " 'the reviewing court cannot say that [they] did not contribute to the defendant's conviction.' " *Jones*, 2016 IL App (1st) 141008, ¶ 23 (quoting *Wheeler*, 226 Ill. 2d at 123). Our review is *de novo*. *Id.*

¶ 68    As an initial matter, the State alleges that defendant forfeited this issue because defense counsel failed to object to the prosecutor's remarks. The State also asserts that defendant "readily acknowledges" his alleged forfeiture. The State's claims are both false. Defendant acknowledges forfeiture with respect to certain allegedly improper remarks in closing argument, not opening statement. And in fact, counsel objected to these remarks at least twice during opening statement (and possibly three times, but the court reporter did not identify the attorney who objected on the third occasion), and then preserved those objections in a motion for new trial. We therefore treat this issue as preserved.

¶ 69    We begin with Khalil, and the preschooler's interest in superheroes that he had acquired in the years since the incident. There was no legitimate reason to broach this topic, much less for the prosecutor to begin her initial address to the jury on this note, because it was obviously irrelevant to the question of guilt, did not orient the jury to any factual issue that would be in dispute, and did not preview for the jury any of the evidence the State expected to elicit. (As

17

defendant notes and the State concedes, Khalil's interest in superheroes was never proven up at trial, and that was surely because it was irrelevant.) In this limited sense, then, Khalil's fondness for superheroes was an inappropriate topic for the prosecutor's opening statement.

¶ 70    But we cannot agree that the mere mention of Khalil is proof that the prosecutor was unfairly playing to the jury's emotions. Khalil was a victim of the home invasion, and that alone was a good reason to mention him in the opening statement. His young age (or more precisely, that he was under twelve) was fair game too; it was alleged in the indictment as a sentencing aggravator, which had to be found by the jury beyond a reasonable doubt. See 725 ILCS 5/111-3(c-5) (West 2010); *People v. Nitz*, 219 Ill. 2d 400, 409 (2006). Thus, Khalil was a perfectly legitimate subject of discussion—to a point—in opening statement.

¶ 71    It bears emphasis that even a clinical and dispassionate description of events that placed a mother and her baby in the path of extreme violence would itself elicit some sympathy—or ire—from a jury. The State was not required to excise Khalil (or Morales) from its overview of the case to avoid eliciting some such response during its opening statement. The question, rather, is whether the prosecutor "dwelled" on Khalil at undue length, or in ways calculated to appeal *unfairly* to the jury's sympathies. See, *e.g.*, *People v. Thomas*, 137 Ill. 2d 500, 525 (1990).

¶ 72    Our answer, in both respects, is no. For one thing, the prosecutor's digression into Khalil's interest in superheroes was brief; the State's opening, as a whole, mostly comprised an overview of the charged offenses and the testimony the State expected to elicit. Defendant's claim that the State's opening "focused" on Khalil is, at best, an overstatement.

¶ 73    Defendant does not identify, and we do not discern, any specific way in which the prosecutor's remarks were likely to elicit undue sympathy toward either Khalil or Morales. In previewing the case to come, the prosecutor was surely permitted to inform (and did inform) the

jury that the men dragged Morales out of a closet, where she was hiding with baby Khalil; unleashed a torrent of violence against everyone else in the apartment, including Khalil's father, while Morales clung to a screaming Khalil on the kitchen floor; and threatened to kill Morales and Khalil if they did not "shut up." These facts themselves, as we noted above, would likely have a strong emotional pull with any jury. As far as engendering sympathy is concerned, Khalil's later-acquired interest in superheroes adds little, if anything, to a brief recitation of the facts of the case.

¶ 74    In short, the prosecutor's opening gambit was not calculated, or otherwise apt, to elicit an unfairly sympathetic reaction from the jury. Rather, its obvious purpose was to provide a foil for introducing the "superhero" theme that the prosecutor would use to extol the testifying officers. We turn now to that issue.

¶ 75    As we have noted, the prosecutor's opening statement described the responding officers, several of whom testified, as "real life *** super heroes." This was not the first time a prosecutor has drawn this comparison in front of a jury. In *People v. Rivera*, 235 Ill. App. 3d 536, 540-41 (1992), we held that similar remarks in closing argument were improper. We agree with defendant that the comparison was improper here, too.

¶ 76    In *Rivera*, the prosecutor began a protracted speech extolling Chicago police officers by asking the jury to reflect on the " 'perception' " of them " 'in our community.' " *Id.* at 540. The prosecutor then argued that " 'growing up as little kids,' " everybody thinks that police officers are " 'running around with little superman outfits under their uniforms.' " *Id.* Everyone " 'looks up to police officers' " as " 'heroes' " and " 'wants to be a police officer' " when he or she grows up. *Id.* The prosecutor offered to explain why: The police officer is " 'the same guy' " who " 'resuscitates the elderly victim,' " who " 'goes out in the alley *** we wouldn't be caught in,' "

19

who " 'gets shot at,' " who " 'has to go into Cabrini Green when there is a family disturbance' " or to " 'the South Side and confront the people in the car, a car whose occupants he cannot see clearly at night.' " *Id.* at 540-41. And so, the prosecutor concluded, perhaps their " 'image' " has been " 'tarnished' " by " 'what you see in the news each night, what you read in the paper each day,' " but " '[i]t's only your perception that has changed. Maybe they do have a big S on their chest. Perhaps.' " *Id.* at 541.

¶ 77 In substance, the prosecutor's remarks in this case were very similar to those in *Rivera*. The State says that the prosecutor's description of the officers as superheroes was meant, in the first instance, to convey that they acted bravely in confronting a dangerous situation. We agree. But we would add that the same was true in *Rivera*, where the prosecutor's speech extolling the police emphasized the courageous acts they routinely perform for the benefit of others. See *id.* at 540-41.

¶ 78 As a corollary to that last point, the State says that the prosecutor's remarks in this case were not directed to "the believability of [the officers'] anticipated testimony." We agree that comparing the officers to superheroes did not specifically assure the jury that it could take their testimony as trustworthy. (Nor, as the State says, did the prosecutor personally vouch for the officers, but defendant does not advance that argument.) Notably, in *Rivera*, we distinguished the superhero comparison from the prosecutor's separate remark that a State's witness (who testified by way of stipulation) was a retired police officer who stood to lose his pension if he got caught lying under oath. *Id.* at 540. That remark spoke directly to the officer's alleged truthfulness and thus to the believability of his testimony; the superhero comparison did not. See *id.*

¶ 79 Yet we agreed with Rivera that the superhero comparison was an improper commentary on "the police officers' credibility in general." *Id.* We did not elaborate on this point, but our

meaning should be obvious enough: The superhero comparison portrayed the officers as exemplary individuals who had earned a special solicitude and deference from others. And when those same officers appear as witnesses for the State, this deferential attitude can translate, all too easily, into uncritically accepting their testimony, or giving it more weight than it merits—even when the prosecutor has not offered any specific, improper assurances about their truthfulness. The prosecutor's remarks in this case carry the same improper implication.

¶ 80    As both parties note, the prosecutor in *Rivera* extolled police officers generally, whereas the prosecutor in this case commented on the actions of the specific officers who would testify. But the prosecutor's comments in *Rivera* about the "credibility" of police officers at large were surely meant to apply—and the jury would surely understand them to apply—to the officers who testified in that case. We think this is a distinction without a difference, and we see no need to further address the parties' arguments about which way it supposedly cuts.

¶ 81    Whether or not the prosecutor specifically intended to bolster the officers' credibility in the minds of the jurors by likening them to superheroes, the comparison carried a significant risk of doing precisely that. And while the prosecutor's development of the superhero theme was relatively cursory compared to its treatment in *Rivera*, the comparison in this case was made in an opening statement, as opposed to a closing argument, and therefore risked coloring the jury's perceptions even before the officers testified. That, of course, is why the parties are not permitted to *argue*—about the credibility of their witnesses or anything else—in their opening statements. See, *e.g.*, *Jones*, 2016 IL App (1st) 141008, ¶ 22.

¶ 82    In sum, the "superhero" comments were clearly improper. They served no relevant purpose and risked bolstering the credibility of the testifying officers. We would have hoped,

after *Rivera*, that the State would have refrained from making such references, and we trust we will not see this improper commentary in opening or closing statements going forward.

¶ 83    Having found these remarks improper, we must now determine whether they might have affected the jury's verdicts and therefore denied defendant a fair trial. With respect to the charge of aggravated criminal sexual assault, we readily answer no, since the officers did not provide any testimony relevant to the question of defendant's accountability for that offense. With respect to the charges of home invasion and armed robbery, the officers testified that defendant was in the apartment when they arrived, and that they found Cromwell's ring and identification card in defendant's pocket. But in so testifying, the officers' credibility was never at issue. Defendant never denied—and in fact conceded—that he was in the apartment when the officers arrived. Instead, defendant's theory of defense was that he was visiting a known drug house when the codefendants, with whom he claimed he had no association, arrived with their own criminal agenda. He thus conceded the truth of the officers' testimony, and offered an alternative explanation of the facts that testimony established. And whether the jury would believe defendant's theory did not depend in any way on whether it found the officers' testimony credible. Lastly, the evidence of defendant's guilt was overwhelming, as he was caught red-handed. We therefore conclude that the improper remarks in the prosecutor's opening statement did not affect the jury's verdicts or deny defendant a fair trial.

¶ 84                              B. Closing Argument

¶ 85    In closing argument, defendant contends, the prosecutor (1) repeatedly misstated the law of accountability; (2) urged the jury to find defendant guilty based on "divine duty" or "divine prophesy"; and (3) improperly invited the jury to stand in Morales's shoes.

¶ 86 A prosecutor has wide latitude in closing argument to comment on, and draw reasonable inferences from, the evidence. *Wheeler*, 226 Ill. 2d at 123. It is improper, however, for a prosecutor to make comments that are calculated only to arouse prejudice or inflame the jury's emotions (*Jones*, 2016 IL App (1st) 141008, ¶ 21), or to misstate the law that defines the offense (*People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29). Closing arguments must be viewed in their entirety; and any challenged remarks must be viewed in their proper context, which may include statements by the prosecutor to which the defense did not properly object. *Wheeler*, 226 Ill. 2d at 122. As with an opening statement, improper comments in closing argument require a new trial only if "the jury could have reached a contrary verdict" in their absence, and our review of this question is *de novo*. *Id.* at 123.

¶ 87 First, defendant argues that the prosecutor misstated the law of accountability in three separate remarks to the jury. The first was this: "Because the law recognizes that criminals are cowards." Defendant does not explain the context of this remark. And in his opening brief, he does not support his assertion that it was improper with any analysis or authority. Defendant does argue his position, for the first time, in his reply brief, leaving the State without a fair opportunity to respond. That aside, defendant's belated arguments are unconvincing.

¶ 88 It is helpful, at the outset, to put this remark in its broader context. The prosecutor began her discussion of accountability—the pivotal legal doctrine for the State's theory of the case— with a verbatim recitation of IPI Criminal 4th No. 5.03, the pattern jury instruction that defines accountability. There is no doubt that aspect of the prosecutor's discussion accurately conveyed the applicable law to the jury. The prosecutor then proceeded to argue what that instruction means, as applied to the facts of this case. Her argument began:

"It means that in this case, since all four defendants went there to commit this home invasion and commit this armed robbery, anything that they do together, any act that they do in furtherance of this, each defendant is responsible for as if he had done it himself. Why? Because the law recognizes that criminals are cowards. That what they might not do by themselves, when they get together with two or three people, they might go and accomplish."

¶ 89 The prosecutor's first, and main, point in these remarks was that the codefendants were all responsible for each others' acts in furtherance of their common design. Whatever those acts included—a proper subject for argument, which the prosecutor went on to address in detail—this was an accurate statement of the general accountability principle that the jury was charged with applying. The question, then, is whether the remark that followed—"Because the law recognizes that criminals are cowards"—might have misled the jury about the meaning or proper application of that legal principle.

¶ 90 To be clear, we do not approve of a prosecutor making such flippant comments about the law to a jury. "Criminals are cowards"—at the risk of belaboring the obvious—is not a principle that the law "recognizes"; nor, as the prosecutor suggested, is the law of accountability premised on the notion that criminals commit crimes together because they are too cowardly to go it alone. See, *e.g.*, *People v. Dennis*, 181 Ill. 2d 87, 105 (1998) (purpose of accountability is to deter concerted criminal action). That said, the prosecutor's remark did not misstate the findings the law requires for a conviction based on accountability, and therefore did not mislead the jury with respect to any question it would actually have to decide.

¶ 91 In the next disputed remark, the prosecutor continued:

24

"So every act, every word, every beat, every threat, every action that happened is if Ned James did it himself, every single one. You don't have to determine who did what. Every single one is responsible for in furtherance of the [objection overruled] those acts. Any time you see the defendant, or one for whom he is legally responsible, defendant Ned James or Henry Sistrunk or Rashawn Coleman or Cortez Moore, defendant, or one for whom he is legally responsible, did an act."

¶ 92   Defendant argues that these comments misstated the law by omitting a critical point: that he could not be held accountable for any of his codefendant's acts unless the State proved those acts were in furtherance of their common design. As we have noted, the prosecutor explicitly acknowledged this burden and argued at length that all of the acts of violence committed in the course of the home invasion *were* in furtherance of the common design to steal money and drugs. She was not obliged to repeat these points *ad nauseam*. Thus, reading this remark in its proper context (see *Wheeler*, 226 Ill. 2d at 122), we find nothing improper.

¶ 93   In the third disputed remark, defendant contends, the prosecutor conflated accountability with but-for causation. Defendant again fails to explain the context of the remark, which, in this instance, was the prosecutor's discussion of IPI Criminal 4th No. 11.58, the issues instruction for aggravated criminal sexual assault. The prosecutor began by reading the propositions the State was required to prove, one of which says, "that the act was committed by force or threat of force." She then addressed this proposition:

"Now we know, we have already gone over the force and threat of force. We know it's by force or threat of force. They would [not] have been able to do it without it. We know it is while they are armed with a firearm and we know [defendant] is accountable for those actions because they broke down the door together. They busted

25

into [A.W.'s] room together. They held her up by gun point together. They forced her to take off her clothes together. They forced her to go into that kitchen and lay down on the ground together.

And while only one person insert—grab her buttocks, inserted her [*sic*] fingers in her and tried to degrade her, they never would have been able to do that but for everyone else's actions. Just like the home invasion and armed robbery, they never would have been able to commit that sexual assault upon [A.W.] without the use of the other people and what they were doing."

Quoting just the second paragraph, defendant argues that the prosecutor used but-for causation as the applicable legal standard in arguing that he was accountable for the sexual assault.

¶ 94    The context of the prosecutor's remark, however, reveals that she was not using but-for causation as the legal standard for accountability. Rather, she was arguing that the codefendants were acting together when they committed various forcible acts, and that each codefendant's use of force helped make possible—in other words, facilitated—the sexual assault. The phrase "but for" was perhaps unnecessary to argue that Coleman's codefendants facilitated his offense against A.W.; but that argument was proper, as it did not misrepresent the findings the law requires for a conviction based on accountability. (Indeed, the prosecutor was presenting the rudiments of the accountability theory that we articulated in affirming defendant's conviction for aggravated criminal sexual assault.) In sum, the prosecutor's accountability arguments were proper.

¶ 95    Second, defendant contends that the prosecutor made an improper religious argument to the jury when she recalled A.W.'s words to Officer Randall: "When you come back with those verdicts of guilty, just like [A.W.] said to Officer Randall, she will say, 'God is good.'"

¶ 96     In this remark, defendant asserts, the prosecutor "implored" the jury to find him guilty in order to fulfill "divine prophesy" and its "divine duty to A.W.," and thus "specifically linked the goodness of God to a guilty verdict." Defendant offers these characterizations without analyzing either the context of A.W.'s original utterance or the prosecutor's reprise of her phrase in closing argument. As a result, defendant's argument mistakes a figure of speech for a genuine invocation of religion.

¶ 97     In *People v. Moore*, 358 Ill. App. 3d 683, 692 (2005), we recognized that not every expression that includes the word "God" conveys a genuinely religious thought or sentiment. The defendant in *Moore* argued that the prosecutor had improperly appealed to the jury's "religious values" in closing argument by suggesting that it was only " 'by the Grace of God' " that the victim survived being shot in the head by the defendant. *Id.* We disagreed, finding that the prosecutor had properly used a "commonplace" "idiomatic expression[ ]," which the jury "would not misconstrue" as an appeal to religious values. *Id.* We have not found any other published case in Illinois that addresses this issue, but courts in other jurisdictions have reached the same conclusion about various colloquial expressions that include the word "God" or biblical imagery. For example, in *Sechrest v. Baker*, 816 F. Supp. 2d 1017, 1055 (D. Nev. 2011), the federal habeas court found that although various expressions the prosecutor had used in closing argument—" 'thank the Good Lord,' " " 'by God,' " and " 'out of the mouths of babes' "— "derive[d] from religious sources" and "include[d] mention of God and the Bible," they "actually carried little religious meaning." More precisely, they did not "convey any religious doctrine" to the jury or "summon religious authority" in support of the prosecution's position. *Id.*; see also *People v. Harrison*, 106 P.3d 895, 921 (Cal. 2005) ("not every reference to the Bible is an appeal to religious authority" because the Bible is not only a religious text but also one of the "best-

known literary works in our culture"). To the contrary, they were everyday "figures of speech." *Sechrest*, 816 F. Supp. 2d at 1055.

¶ 98    So too was the expression "God is good." Consider the context in which A.W. originally uttered it: After the police arrived and detained the intruders, A.W. emerged from a utility closet, naked, where she was hiding with Morales; hugged Officer Randall; and said, "God is good." A reasonable jury would understand A.W.'s utterance to express her gratitude to the officers and—above all—her relief that this terrifying violence was over. In these circumstances, we can just as easily imagine A.W. saying "thank God," "thank Heaven," "thank goodness," or, as in *Sechrest*, "thank the Good Lord," as she hugged Officer Randall. Indeed, in a remark that defendant does *not* challenge, the prosecutor described the arrival of the police like this: "But then, thank God, just when they thought they couldn't take any more, just when they thought they and their loved ones would be killed, the Chicago Police Department arrived ***." A.W.'s expression was just one more variant of this common idiom.

¶ 99    We see no indication that the prosecutor intended anything other than this same idiomatic meaning. The prosecutor reprised A.W.'s utterance at the conclusion of her argument, as part of her final appeal to the jury: "with your verdicts of guilty," "the terror will end," and A.W. will again say "God is good." In this context, the prosecutor was referring not to God's will but to a sense of closure and relief for the victims.

¶ 100   In sum, we find no indication that either A.W. or the prosecutor was literally commenting on the will of God. Rather, they were using one of the many commonplace idioms in the English language that include the word 'God' but are routinely used without conveying any genuinely religious meaning. Thus, we find the prosecutor's remark proper.

28

¶ 101  Defendant's cited authorities, *State v. Ceballos*, 832 A.2d 14 (Conn. 2003), and *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000), are not persuasive because the prosecutors in these cases made genuinely religious arguments to the jury. In *Sandoval*, 241 F.3d at 775-76, the prosecutor argued at the penalty phase of a capital trial that God approved of the death penalty; liberally paraphrased Romans 13:1-5, a New Testament passage commonly understood as providing justification for the death penalty, and argued that sentencing the defendant to death would be " 'doing what God says.' " Here, in contrast, the prosecutor did not genuinely claim that God approved of the State's position (for the reasons we have already given), or invoke any religious doctrine or authority to support that position.

¶ 102  In *Ceballos*, 832 A.2d at 30-31, the prosecutor argued that the victim was credible because she " 'believed God would punish her if she lied' "; the defendant, in contrast, was not credible because he was " 'not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday.' " The court held that this argument intruded on the jury's role as the sole judge of the witnesses' credibility by suggesting that "another trier of fact, a divine one nonetheless," had already found the defendant guilty and was waiting "to punish him for his lack of veracity." *Id.* at 36. Here, the prosecutor conveyed no such meaning and did not use religious belief as a basis for distinguishing the credibility of competing witnesses. And in *Ceballos*, the prosecutor further argued that the defendant wanted the jury " 'to believe that pure evil, Satan's daughter, appeared *** in this courtroom' " in the form of the victim. *Id.* at 31. But here, for the reasons we have given, there were no such "direct invocations of religious characters," and thus no "inflammatory emotional appeal to the passions and prejudices of the jury" made on that basis. See *id.* at 36.

¶ 103   We would urge prosecutors to be cautious in their use of idiomatic references to God or literary allusions to religious texts. We agree with the Supreme Court of California that the line between their permissible use and improper religious appeal to the jury is often "a fine one," and that a prosecutor who employs such references freely therefore "runs a grave risk" of committing misconduct. See *Harrison*, 106 P.3d at 921. That fine line, however, was not crossed in this case.

¶ 104   Third, defendant contends that the prosecutor improperly "placed the jurors in the shoes of Maritza Morales." After Morales saw the men attack Cromwell, she hid in the bedroom closet with baby Khalil. Looking out into the bedroom, Morales saw a man, whom the State argued was defendant, walk in wearing a mask. Over defense objection, the prosecutor asked the jury, "Can you imagine that scene?" She then proceeded to describe the "scene" in these terms:

> "She is cowering in there. What does Khalil Cromwell [Jr.] do? Oh look, a hang[e]r. He pulls a hang[e]r. His head flips around. His head. [']What do you think you are playing with me?['] [Defendant] drags her out of the closet by her hair and she is dragged into the kitchen where she sees her loved one, Khalil, on the ground duct taped and screaming. [']Please don't hurt my baby. Please don't hurt my baby.['] She is carrying her baby in and sees blood all over the floor. She is cowering on the corner, turned around making sure Khalil [Jr.] is not going to die is what they told you, making sure he is not going to die."

¶ 105   A prosecutor is free to describe a "cold-blooded and horrific" offense for what it was, but may not "invite the jurors to enter into some sort of empathetic identification with the victims." *People v. Spreitzer*, 123 Ill. 2d 1, 38 (1988). In *Spreitzer*, on which defendant relies, the prosecutor asked the jurors to " '[t]hink of it. You, any of us walking down a street, being grabbed by one, two or three individuals like this man, who have one intent, to kill somebody, to

30

kill you.' " *Id.* at 37. He then explicitly invited the jurors, no less than three times, to " '[p]lace yourself in the shoes' " of the victims, and think about " '[w]hat went through their minds' " as the offense unfolded. *Id.* at 38. These remarks were improper because they invited the jurors to identify with the victims—that is, to imagine themselves as the victims of similar offenses—and, in turn, to sentence the defendant to death based on the fear of being similarly victimized that this imaginative exercise provoked. See *id.* at 37-38.

¶ 106   The remarks at issue here were unlike those in *Spreitzer.* By and large, the prosecutor was simply describing what defendant did to Morales, rather than inviting the jurors to imagine themselves as Morales. Here, the prosecutor did not ask the jurors to put themselves in Morales's shoes; she asked them to imagine "the scene," by which, the State says, she was asking them to picture the crime scene. After describing the events in Morales's bedroom closet, the prosecutor immediately began to describe what the codefendants did to Andrews and A.W. in the other bedroom. This supports the State's contention that the prosecutor was walking the jury, room by room, through the crime scene, marshalling evidence that the home invasion was committed by force or threat of force with respect to each of the victims. We agree that it was gratuitous, and pushing the bounds of propriety, for the prosecutor to add, "Please don't hurt my baby. Please don't hurt my baby," into her description of the "scene." That did not help the prosecutor prove the proposition relating to the use of force for home invasion. But this was a single, fleeting remark, made in a context in which (as we have noted) the mere reminder that a mother had to endure this senseless violence while holding a nine-month-old baby surely would have stirred the jurors' emotions, anyway. We cannot say that this alone was misconduct.

¶ 107   The remaining cases cited by defendant are easily distinguished. In *People v. Wood*, 341 Ill. App. 3d 599, 603 (2003), the prosecutor "asked the jurors to imagine themselves in the shoes

31

of the victim and her family." In this way, *Wood* is just like *Spreitzer*, and therefore unlike this case for the same reasons. And *People v. Fortson*, 110 Ill. App. 2d 206 (1969), is simply irrelevant. The prosecutor's error in that case was singling out the women on the jury and asking them to imagine themselves " 'in the place of' " the rape victim. *Id.* at 216 ("individual members of the jury should not be singled out by counsel").

¶ 108    For these reasons, we find no error in the prosecutor's closing argument. Thus, we do not address defendant's plain-error or ineffective-assistance arguments regarding those remarks that were not met with defense objection at trial.

¶ 109                                C. Cumulative Error

¶ 110   Lastly, defendant argues that the prosecutor's various remarks, taken cumulatively, were reversible error, even if no one remark was reversible error on its own. Since we have only found one error, pertaining to opening statement, and that error was harmless, there was no cumulative error, either.

¶ 111                                III

¶ 112   Defendant contends that the trial court erred in omitting the following bracketed language from IPI Criminal 4th No. 3.06-3.07:

> "You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine [whether the defendant made the statements, and, if so,] what weight should be given to the statement [*sic*]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." IPI Criminal 4th No. 3.06-3.07.

That bracketed language should be omitted only when the defendant admits that he made the statements at issue. IPI Criminal 4th No. 3.06-3.07, Committee Note; *Richmond*, 341 Ill. App. 3d at 51. Here, the instruction was based on the codefendants' repeated threats to kill or stab the victims, and the various commands (*e.g.*, to give up their money and drugs; to stay on the floor; or in A.W.'s case, to take off her clothes and spread her legs) that they directed at the victims in the course of the offenses. Defendant did not admit that he made any of these "statements," and they could not be attributed to him with certainty, since the intruders were mostly masked and the victims were not sure who said what. Thus, defendant argues, the jury should have been instructed that it was free to decide for itself *whether* he made any of these "statements" in the first place.

¶ 113   We hold that the threats and commands on which the instruction was based were not "statements" within the meaning of IPI Criminal 4th No. 3.06-3.07. Because the instruction does not apply to those utterances (as we will continue to call them), we reject defendant's argument that the jury should have been given the instruction with the bracketed language included. Instead, we hold that it was error for the trial court to give this instruction at all. Defendant has forfeited that error, but in any event, it was harmless.


¶ 114                                                A

¶ 115   Our first task is to interpret the meaning of the phrase "statements relating to the offenses charged" in IPI Criminal 4th No. 3.06-3.07. The meaning of a word or phrase used in a jury instruction presents a question of law. *People v. McBride*, 2012 IL App (1st) 100375, ¶ 51. Our review is therefore *de novo*. See *In re A.A.*, 2015 IL 11860543, ¶ 21.

¶ 116   When we interpret a statute, we begin with the plain and ordinary meaning of the words used. *People v. Bywater*, 223 Ill. 2d 477, 481 (2006). In particular, we give an "undefined word" in a statute "its ordinary and popularly understood meaning." *In re Ryan B.*, 212 Ill. 2d 226, 232 (2004). To discern that meaning, "it is 'entirely appropriate' to consult the dictionaries." *People v. Barnes*, 2017 IL App (1st) 142886, ¶ 35 (quoting *People v. Bingham*, 2014 IL 115964, ¶ 55). Since the interpretation of a jury instruction is, in many respects, akin to statutory interpretation, we think these principles provide a helpful starting point for our inquiry here, too.

¶ 117   Generally speaking, the term "statement" has several related meanings. In the context of a criminal case, one such meaning is particularly relevant: "An account of a person's knowledge of a crime, taken by the police during their investigation of the offense." Black's Law Dictionary (10th ed. 2014); see also Webster's Third New International Dictionary 2229 ("a formal declaration *** made in the course of some official proceeding (as a statement of a witness ***)"). Examples of such formal statements, which are commonly introduced into evidence at criminal trials, include a defendant's handwritten or other custodial statement given to the police or prosecutors in the course of an interrogation.

¶ 118   But an admissible statement need not be formal, in the above sense, or made to law enforcement. A witness's prior inconsistent hearsay statement, for example, may be admissible for the limited purpose of impeaching the declarant, and the statement need not have been made to the police. See 725 ILCS 5/115-10.1(c) (West 2010). This usage reflects the most general definition of the term "statement," which includes any "verbal assertion or nonverbal conduct intended as an assertion." Black's Law Dictionary (10th ed. 2014); see also Webster's Third New International Dictionary 2229 ("something stated: as a report or narrative (as of facts, events, or opinions)"; "a single declaration or remark: allegation, assertion"); 725 ILCS 5/115-

10.1(c)(2) (West 2010) (prior inconsistent statement may be admissible if it "narrates, describes, or explains an event or condition of which the witness had personal knowledge").

¶ 119   We need not decide, at this time, whether IPI Criminal 4th No. 3.06-3.07 applies only to formal statements given to law enforcement, or, more broadly, to any assertions of fact about the offense that the defendant may have made, to anyone, in any informal context. But either way, to qualify as a statement, an utterance or writing must make a claim about a matter of fact; it must express a proposition that is either true or false. Threats and commands are not assertions; and thus, even in the most general sense of the term, they are not statements.

¶ 120   We acknowledge that defendant, the State, and the trial court all seemed to think it was obvious that the threats and commands directed at the victims were "statements relating to the offenses" within the meaning of the instruction. We think this conflates the term "statement," in its proper usages, with the far more general term "utterance," which could apply to these (or any other) types of nondeclarative speech. Notably, the parties have not cited, and we have not found, any case in which the instruction was based on a threat, command, or other type of nondeclarative utterance. In every case to reach a reviewing court, the instruction was based on the defendant's confession, admission, or false exculpatory statement—in a word, the defendant's self-incriminating statement. We are not aware of any case specifically limiting IPI Criminal 4th No. 3.06-3.07 to these (or any other) types of statements, but we now explicitly hold that this is the instruction's proper scope.

¶ 121   The history and origins of IPI Criminal No. 3.06-3.07 support this interpretation. The instruction was adopted in the second edition of the IPI, and it has not been modified since. It was meant to consolidate and replace two instructions from the first edition—Nos. 3.06 and 3.07—that had proven problematic.

¶ 122    Instruction No. 3.06 in the first edition of the IPI, entitled "Admission," provided as follows:

"You have before you evidence that [the] [a] defendant made [an admission—admissions] of [a fact—facts] relating to the crime charged in the indictment.

It is for you to determine [whether the defendant made the admission(s), and, if so,] what weight should be given to the [admission—admissions]. In determining the weight to be given to an admission, you should consider all of the circumstances under which it was made." Illinois Pattern Jury Instructions, Criminal, No. 3.06 (1st ed. 1961) (hereinafter IPI Criminal 1st No. 3.06).

¶ 123    Similarly, Instruction No. 3.07, entitled "Confession," provided as follows:

"You have before you evidence that [the] [a] defendant confessed that he committed the crime charged in the indictment. It is for you to determine [whether the defendant confessed, and, if so,] what weight should be given to the confession. In determining the weight to be given to confession, you should consider all of the circumstances under which it was made." IPI Criminal 1st No. 3.07

¶ 124    As with the current instruction, IPI Criminal 4th No. 3.06-3.07, the committee notes accompanying both instructions in the first edition specified that the bracketed portions should be "deleted only when the defendant admits making all the material statements attributed to him." IPI Criminal 1st Nos. 3.06, 3.07, Committee Notes.

¶ 125    Having two separate jury instructions required the parties to litigate the question whether a statement was a strict confession of guilt or merely an admission of an incriminating fact. And it required the trial court to communicate this legal conclusion in its instructions to the jury. This

line can be difficult to draw, and the wrong instruction could prove highly prejudicial, because a judge's "characterization of a statement as a confession may discourage a jury from making a close analysis of what defendant actually said." (Internal quotation marks omitted.) *People v. Horton*, 65 Ill. 2d 413, 418 (1976). For this reason, it was error, and often reversible error, "to instruct a jury that defendant has confessed to a crime when he has made only an admission." (Internal quotation marks omitted.) *Id.* (citing cases); see, *e.g.*, *People v. Floyd*, 103 Ill. 2d 541, 548-49 (1984) (conviction reversed on this ground).

¶ 126   In the second edition, these two instructions were consolidated into one, IPI Criminal No. 3.06-3.07, which used the general term "statement" in place of the more specific terms "confession" and "admission." Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.06-3.07). These changes were made to "avoid[ ] the complications that ensue when a judge characterizes a statement" and thereby eliminate this unnecessary risk of prejudice to the defendant. IPI Criminal 2d No. 3.06-3.07, Committee Note; *Floyd*, 103 Ill. 2d at 549. Notably, the Seventh Circuit's substantively identical pattern instruction also "utilizes the word 'statement' in place of words such as 'admission' and 'confession'," and for precisely the same reasons: "the word 'statements' is a more neutral description" that does not convey any judicial characterization of the defendant's words to the jury, and it "eliminates the need for additional debate or litigation regarding whether a particular statement fits the definition of a 'strict confession.' " (Internal quotation marks omitted.) Pattern Criminal Jury Instructions of the Seventh Circuit, No. 3.09, Committee Comment (2012 ed.); *United States v. Gardner*, 516 F.2d 334, 345-46 (7th Cir. 1975); see *Opper v. United States*, 348 U.S. 84, 91 (1954) ("a strict confession," as distinct from an admission, is a "complete and conscious admission of guilt").

¶ 127   There is no indication that the general term "statement" was meant to be broader than the antecedent categories it replaced. Indeed, the committee made clear in its comment that the new instruction reflected its determination that "whether a statement is an admission, confession, or false exculpatory statement is a legal conclusion that ought not to be communicated to the jury." IPI Criminal 2d No. 3.06-3.07, Committee Note. While this might seem to add a new category— false exculpatory statements—to the instruction's purview, such statements are considered a species of admissions because they are incriminating. See, *e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 477 (1966) ("no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory,' " as the latter, when proven false, are "incriminating in any meaningful sense of the word"); *People v. Gerrior*, 155 Ill. App. 3d 949, 954 (1987) (defendant's statement to police denying that he committed robbery "was relevant as an admission" of certain material facts). In short, IPI Criminal 2d No 3.06-3.07 did not substantively extend the scope of the first-edition instructions it replaced. Like its predecessors, it applies only to a defendant's self-incriminating statements: confessions and admissions, in the first instance, and false exculpatory statements by extension.

¶ 128   Moreover, the instruction addresses a specific problem that arises only when a defendant has made a self-incriminating statement about the charged offense(s). For the moment, we will follow the practice of the relevant case law and speak in terms of confessions, but as we will see, the point applies to self-incriminating statements generally.

¶ 129   To be admissible, a confession must be voluntary, a threshold legal determination that is made by the trial judge. *People v. Jefferson*, 184 Ill. 2d 486, 498 (1998). But even after a confession has been found to be voluntary, a defendant may still present evidence to the jury that affects its credibility or weight, or that challenges its reliability or truth. *Id.*; *People v. Cook*, 33

Ill. 2d 363, 369-70 (1965); *People v. Johnson*, 385 Ill. App. 3d 585, 598 (2008); see also 725 ILCS 5/114-11(f) (West 2010) ("The issue of the admissibility of the confession shall not be submitted to the jury. The circumstances surrounding the making of the confession may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession."). The jury's credibility inquiry will often turn on largely the same evidence as the judge's voluntariness inquiry, but the two are nonetheless "separate inquires"; and the latter, a factual matter, is "exclusively for the jury to assess." *Crane v. Kentucky*, 476 U.S. 683, 688 (1986).

¶ 130   In *Crane*, the Supreme Court emphasized the importance of giving the jury an active role in assessing the credibility of a defendant's (alleged) confession. If that evidence could not be put before the jury, the defendant would be "effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Id.* at 689. Evidence concerning "the manner in which a confession was secured" will often be critical to the defendant's attempt to cast doubt upon the confession's "credibility," minimize its "probative weight," or show that it was "insufficiently corroborated or otherwise unworthy of belief." (Internal quotation marks omitted.) *Id.* at 688-89. And all of this applies equally to admissions and statements intended to be exculpatory—both of which entail "the pressure of coercion" and "the same possibilities for error," and so "call for corroboration to the same extent as," strict confessions. See *Opper*, 348 U.S. at 91-92.

¶ 131   IPI Criminal 4th No. 3.06-3.07 instructs the jury to undertake this factual inquiry and guides the jury in this role. By instructing the jury to expressly consider whether the defendant's self-incriminating statement was credible, given the circumstances in which it was elicited, the instruction prevents the jury from simply assuming that the defendant must be guilty because he

(ostensibly) admitted his guilt. As *Crane* reminds us, that inference is all too easy for a jury to make. 476 U.S. at 689; see also *People v. R.C.*, 108 Ill. 2d 349, 356 (1985) ("[A] confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable."). The presentation of a defendant's self-incriminating statement to a jury thus warrants a special cautionary instruction. IPI Criminal 4th No. 3.06-3.07 is that instruction.

¶ 132　In contrast, this cautionary instruction has no meaningful application to nondeclarative utterances like threats and commands. There is no intelligible concern that a defendant may have been led to falsely incriminate himself when he threatened or verbally coerced a victim. It makes no sense to ask whether a threat or command was elicited in circumstances that rendered it unworthy of belief. And there is no question of how much "weight" to give a defendant's threat of force against a victim; when the defendant is charged with armed robbery or home invasion, for example, the use or threat of force is an element of the offense, and the defendant either engaged in that conduct or not. See 720 ILCS 5/18-2(a) (West 2010); 720 ILCS 5/12-11(a)(1) (West 2010) (recodified as amended at 720 ILCS 5/19-6 (West 2014)). To be sure, there is a question of how much weight to give the testimony of the *witnesses* who reported the alleged threats, but by its terms, IPI Criminal 4th No. 3.06-3.07 does not apply to *their* testimony. And it doesn't need to; their testimony is fully addressed by IPI Criminal 4th No. 1.02, the general instruction on the jury's role as the sole judges of "the believability of the witnesses and of the weight to be given to [their] testimony." IPI Criminal 4th No. 1.02. In short, there is simply no meaningful way to apply IPI Criminal 4th No. 3.06-3.07 to nondeclarative utterances like threats or commands.

¶ 133  For these reasons, we hold that IPI Criminal 4th No. 3.06-3.07 applies to a defendant's self-incriminating statements—confessions, admissions, or false exculpatory statements—relating to the charged offense(s).

¶ 134  As we have interpreted the instruction, its guiding concern is the possibility that a false or unreliable incriminating statement was elicited from the defendant. This concern, at a minimum, is most pressing when the statement at issue was a formal statement made to law enforcement. See, *e.g.*, *United States v. Broeske*, 178 F.3d 887, 889-90 (7th Cir. 1999) (limiting circuit's corresponding instruction to statements made to law enforcement). As we noted at the outset, however, we do not need to decide in this case whether IPI Criminal 4th No. 3.06-3.07 is limited to such statements, and we reiterate that our holding today should not be taken to answer that question.

¶ 135                                    B

¶ 136  Having settled on the meaning of the term "statements relating to the offenses" in IPI Criminal 4th No. 3.06-3.07, we must now determine whether it was error for the trial court to instruct the jury as it did, and, if so, whether that error entitles defendant to a new trial. We review the trial court's decision whether to give a jury instruction for an abuse of discretion. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009).

¶ 137  It was error for the trial court to give IPI Criminal 4th No. 3.06-3.07 in this case. As we have noted, the instruction was given based solely on the threats and commands that the codefendants directed at the victims throughout the home invasion. No self-incriminating statements by defendant, either to law enforcement or any other third parties, were put before the

jury. Thus, there was no basis for this instruction. It should not have been given—with or without the bracketed language.

¶ 138 Defendant, however, has forfeited that error. Our supreme court has held that "a specific objection [to a jury instruction] waives all other unspecified grounds." *E.g.*, *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005). On appeal, defendant contends only that the omission of the bracketed language was error, arguing, as he did in the trial court, that none of the utterances at issue could be specifically attributed to him. He does not claim that it was error to give the instruction at all, and he does not dispute that the utterances at issue were "statements" to which the instruction applies. Nor, for that matter, did defendant raise this error in the trial court. There, defendant did object to giving the instruction, but he did so on the ground that the utterances at issue could not be specifically attributed to him; he did not dispute the assumption that those utterances were "statements" and thus a proper basis for the instruction in the first place.

¶ 139 Forfeiture aside, the improper instruction was inconsequential; even if the error had been preserved at trial and raised on appeal, we would find it harmless. An error in a jury instruction is harmless if a properly instructed jury would have rendered the same verdicts. *People v. Kirchner*, 194 Ill. 2d 502, 557 (2000).

¶ 140 We begin with a preliminary question: How might defendant's jury have understood this instruction? The jury heard no evidence that defendant made, or allegedly made, any statements about the offenses. Thus, if the jury understood the term "statements" to have its ordinary meaning, it would not have found any use for this instruction. Moreover, the jury instructions as a whole did not define the term "statements" or specify what alleged "statements" fell within the instruction's purview. So what, if anything, might the jury have done with the instruction? We cannot know for sure. But one possibility is that the jury did not apply the instruction at all

because there was nothing it logically applied to. In those circumstances, the superfluous instruction might have puzzled the jury, but it did not prejudice defendant.

¶ 141   The other possibility is that the jury (mis)understood the instruction in the same way as the parties, and so applied—or tried to apply—it to the threats and commands at issue. Indeed, if the jury applied the instruction to anything, it must have been these utterances, since the jury did not hear evidence of any others. The question we then face is whether the instruction, as given, and thus understood, prejudiced defendant. Defendant argues that it did, because it prevented the jury from considering whether he personally uttered any of those threats or commands. We disagree.

¶ 142   The State's theory was that the codefendants were all accountable for each other's actions because they shared a common criminal design. The threats of violence and other verbal acts of compulsion were directed at the victims in furtherance of the common design. (Granted, we have rejected the State's common-design theory with respect to the sexual assault, but since defendant was still accountable for that offense, our conclusion here does not change.) As the prosecutor argued in closing, the codefendants "act[ed] together" and "worked together," so that "every act, *every word*, every beat, *every threat*, every action that happened is as if Ned James did it himself, every single one." (Emphases added.) Indeed, if defendant was accountable for his confederates' actions, it is irrelevant whether he personally uttered any threats or commands at the victims. The instruction did not prejudice defendant.

¶ 143   Defendant argues, however, that attributing these utterances to him was "crucial" to the State's proof of accountability, especially with respect to the sexual-assault charge. Not so. With respect to the armed robbery and home invasion, defendant was caught red-handed: He was still in the apartment when the police arrived; he had Cromwell's wallet in his pocket; and his DNA

was found on one of the masks worn by an intruder during the offenses. The evidence of his guilt was overwhelming, without attributing any commands or threats to him at all.

¶ 144    With respect to the charge of aggravated criminal sexual assault, defendant argues that nothing linked him to Coleman's offense *except* the commands that A.W. undress and spread her legs, and the accompanying vulgar remarks about her genitals. We disagree. As we previously explained, defendant was accountable for the sexual assault because he contributed to the show of force used to strip A.W. in the bedroom—whether or not he was one of the men who actually ordered her to undress or spread her legs. Because it was not necessary for the jury to find that defendant personally ordered her to do so, we conclude that the erroneous instruction did not affect the jury's verdict.

¶ 145    For these reasons, we conclude that the trial court's erroneous instruction does not entitle defendant to a new trial.

¶ 146                                      IV

¶ 147    Defendant contends that the trial court failed to conduct an adequate preliminary *Krankel* inquiry. See *People v. Krankel*, 102 Ill. 2d 181 (1984). Pursuant to *Krankel*, the trial court must "conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 79 (2003). No specific procedure is mandated, but an adequate inquiry will generally involve "some interchange" between the judge, the defendant, and counsel. *Id.* at 78. The defendant must be permitted to articulate his complaints about counsel and explain their factual basis, while counsel may help "explain the facts and circumstances surrounding the defendant's allegations." *Id.* If this initial "probe" reveals that the allegations are "conclusory, misleading, or legally

immaterial," or do not state a "colorable claim" of ineffective assistance, the trial court "may be excused from further inquiry." (Internal quotation marks omitted.) *People v. Ford*, 368 Ill. App. 3d 271, 276 (2006). We review the adequacy of the trial court's inquiry *de novo*. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 80.

¶ 148 At his sentencing hearing, defendant alleged that his attorney was ineffective. His first specific allegation was, "I kept telling my lawyer I want to testify." Liberally construed, we take this statement to allege that counsel prevented him from testifying. Because this allegation could potentially support a claim of ineffective assistance (*People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009)), the trial court had a duty to ascertain its factual basis and not reject it out-of-hand. Defendant argues that the court did just that, with no inquiry into its factual basis at all.

¶ 149 We disagree. The trial court did not pose any questions to defendant about this allegation or make any explicit findings as to its possible merit. But that does not show that the trial court brushed it off without any inquiry into its purported basis. The trial court gave defendant the floor, and he elaborated on his statement that he had told counsel that he wanted to testify. In doing so, defendant referred to a note he had passed to counsel expressing that desire, which also had counsel's response on it. As defendant said to the judge, "I didn't testify on the stand. You asked me. I wrote it down. I passed it to [counsel]. I passed it to her. I said, [counsel], the judge asked me could I testify. [Counsel] said—she wrote back, which is her writing, her writing right here, she said, 'Dear Ned, the trial is over, you don't need to take the stand.'" While defendant's remark was in some respects disjointed and difficult to follow, it certainly implied that his allegation was based on an exchange he had with counsel *after* the trial had concluded. And indeed, counsel soon asked the judge that she "be allowed to clarify that in fact, [defendant] did ask me and I did respond after the verdict was returned."

¶ 150    In short, defendant explained the purported factual basis of this allegation, counsel helped to clarify the circumstances from which it arose, and together their explanations revealed that the allegation was deficient on its face. Thus, the trial court conducted all the inquiry—in the broad and "flexible" sense recognized by the *Krankel* procedure (see, *e.g.*, *Moore*, 207 Ill. 2d at 78)— that was necessary with regard to this allegation.

¶ 151    Defendant's second specific allegation was, "And I feel like she made a few errors during her closing argument when she told [the jury] that, yes, Mr. Ned James was in the—at the house, and yes, Mr. Ned James was struck by *** one of the victims."

¶ 152    Faced with overwhelming and undisputed evidence, counsel had conceded that defendant was in the apartment at the time of the offenses. Counsel had argued, however, that defendant was merely visiting a known drug house when the others, with whom he had no association, arrived with their own criminal agenda. Counsel also conceded, based the undisputed testimony of Andrews and Officer Randall, that Andrews punched or kicked defendant after he was detained by the police inside the apartment.

¶ 153    These concessions were "errors" and "prejudice to the defense," defendant argued, because "[n]one of the victims got up there and identified me and said I did anything." When the trial court observed that the police actually found him inside the apartment, defendant presented a new defense, one sharply at odds with the theory counsel had argued: After the police detained the three intruders they were told by dispatch to look for, the officers found him in the stairwell, took him to the apartment, and insisted—for whatever reason—that he was "the fourth person." This is the theory, defendant implied, that counsel should have advanced in closing argument— and the "story" that he "need[ed]" to "tell" on the witness stand.

¶ 154 The credibility of these allegations aside, it is clear that defendant objected to counsel's choice of defense theory. "[T]he choice of defense theory is ordinarily a matter of trial strategy," and since counsel "has the ultimate authority to decide" that strategy, an ineffective-assistance claim cannot be based on counsel's choice of an allegedly "inadequate" strategy. *People v. Guest*, 166 Ill. 2d 381, 394 (1995). Because defendant's explanation made clear that he could not state a "colorable claim" of ineffective assistance based on his contention of "errors" in closing argument, the trial court did not need to conduct any further inquiry. See *Ford*, 368 Ill. App. 3d at 276.

¶ 155 Lastly, defendant also told the trial judge at his sentencing hearing that he had prepared a *pro se* "motion for ineffectiveness of counsel." The trial judge did not review the motion or make any inquiry into its allegations. Instead, the judge told defendant to "[f]ile that after" sentencing and then proceeded to sentence defendant. Before admonishing defendant as to his appeal rights, the trial court said, "Mr. James, we'll go over one last thing together, and then I'll wait for your post-trial motions, and if necessary, I'll appoint counsel to represent you on any assertions you make at that time." It does not appear from the record that defendant filed his motion. On appeal, he argues that the judge "actively misled" him because the motion, which he now describes as a motion for new trial, would have been "procedurally barred" after sentencing.

¶ 156 We reject this argument. A "*pro se* posttrial motion alleging ineffective assistance of counsel is not a new trial motion" and therefore is not subject to the procedural limitations that apply to the latter. *People v. Patrick*, 2011 IL 111666, ¶ 30 (*pro se* motion alleging ineffective assistance not subject to time limitation in section 116-1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1(b) (West 2010))). In *Patrick*, our supreme court held that the trial court was required to conduct a preliminary *Krankel* inquiry into a *pro se* motion alleging ineffective

assistance that was filed after the defendant was sentenced, but before he filed a notice of appeal. *Id.* ¶¶ 11-14, 39-43. Under *Patrick*, the trial court could not have dismissed defendant's motion as "procedurally barred" if defendant had filed it as the trial court instructed him to. Moreover, the trial court specifically reminded defendant to file his motion at the end of the sentencing hearing, but defendant failed to do so. Without defendant's motion in hand, there was no further inquiry for the trial court to make.

¶ 157                                                    V

¶ 158    Defendant, who was found accountable for the aggravated criminal sexual assault against A.W., was sentenced to 40 years for this offense. Coleman, who actually committed the offense, was sentenced to 21 years—the minimum prison term, including the mandatory 15-year firearm enhancement. See 720 ILCS 5/12-14(a)(8), (d)(1) (West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010). Defendant claims that, because Coleman was the more culpable party, their sentences are unfairly disparate, and he requests that we reduce his sentence to the same minimum term of 21 years. See Ill. S. Ct. R. 615(b)(4). Defendant does not request any lesser relief in the alternative—such as reducing his sentence to a term somewhere between 21 and 40 years, or remanding for resentencing—so we do not consider whether any such relief is warranted.

¶ 159    A disparity in codefendants' sentences may be warranted by differences in the nature and extent of their participation in the crime, or by other relevant sentencing factors, including, especially, their respective criminal histories and potential for rehabilitation. *People v. Spears*, 50 Ill. 2d 14, 18 (1971); *People v. Jackson*, 145 Ill. App. 3d 626, 646 (1986). A trial court has broad sentencing discretion, and we will not reverse its decision absent an abuse of that discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005).

¶ 160   We agree that Coleman was more culpable than defendant for this offense, as it was Coleman who digitally penetrated A.W. But we do not agree that defendant necessarily deserves the same minimum sentence as Coleman on this basis alone. To accept defendant's argument, we would have to conclude that defendant's participation in, and thus his culpability for, the sexual assault was so minimal that it would be unfair to increase his sentence *at all* based on any other sentencing factors. We reject this extreme contention, for two principal reasons.

¶ 161   First, while Coleman was the more culpable actor, defendant dramatically overstates this point. We cannot accept his assertion that he "did not participate in nor assist Coleman's assault on A.W. in any way." As we explained in rejecting his reasonable-doubt argument, the evidence supported a finding that defendant participated in the preliminary conduct in A.W.'s bedroom that culminated in, and indeed facilitated, her sexual assault. At gunpoint, the men forced A.W. to get out of bed, strip naked, spread her legs, and display her genitals for the men's inspection and commentary. This conduct was highly culpable and offensive in its own right; it also facilitated A.W.'s sexual assault by rendering her vulnerable to Coleman's act of penetration. Defendant's involvement in, and culpability for, this offense was therefore substantial.

¶ 162   Second, defendant's criminal history was also substantial—and significantly worse than Coleman's. Coleman had one prior conviction for harassment and stalking, a gross misdemeanor in Minnesota (Minn. Stat. § 609.749) (West 2009), for which he was sentenced to two years of probation. See *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010) (reviewing court may take judicial notice of codefendant's related appeal). The trial judge based Coleman's minimum sentence, in part, on "the fact that [Coleman] has a limited criminal history, distinguishing him from pretty much at least all the other defendants I sentenced in this case, Mr. Ned James."

¶ 163   Defendant's criminal history included a conviction for attempted first-degree murder, for which he was sentenced to 12 years in prison. Defendant served his entire sentence, having lost all of his good-time credits; moreover, he was convicted of aggravated battery of a peace officer while he was in custody and sentenced to another two years in prison. As a result, defendant was still on mandatory supervised release when he committed the present offenses. At his sentencing hearing, Cook County sheriff's officers testified that while these proceedings were pending in the circuit court, defendant attacked a guard in the Cook County jail and intimidated an inmate, who had cooperated with federal authorities on another matter, into paying $3000 in protection money to the Gangster Disciples.

¶ 164   Defendant's criminal history thus comprised a more-or-less continuous stream of violent and coercive conduct, both in and out of custody. Because of this troubling pattern, the trial court observed that defendant "is, in every sense of the word, a recidivist," and that his "recidivism consistently involves hurting other people." Moreover, because defendant's violent and coercive conduct has continued even while he has been incarcerated, his criminal history demonstrates, quite starkly, that his prospects for rehabilitation are regrettably poor.

¶ 165   In light of defendant's substantial culpability for this offense and his significant criminal history, we cannot conclude that the trial court abused its sentencing discretion at all, much less that defendant is entitled to have his sentence reduced to the statutory minimum. We affirm his sentence for aggravated criminal sexual assault.

¶ 166                                                     VI

¶ 167   The trial court ordered defendant to serve his 50-year sentence for home invasion at 85% time. Defendant challenges this ruling, arguing, among other things, that the trial court never made the necessary finding of great bodily harm before ordering that the home-invasion sentence be served at 85%.

¶ 168   Defendant was sentenced to consecutive prison terms of 50 years for home invasion and 40 years for aggravated criminal sexual assault. Summing up, the trial court stated, "[t]hat's a 90-year sentence of which he has to serve 85 percent." Any sentence for aggravated criminal sexual assault must be served at 85% time. 730 ILCS 5/3-6-3(a)(2)(ii).

¶ 169   But a sentence for home invasion is served at 50% time, unless the trial court makes a finding that "the conduct leading to conviction *** resulted in great bodily harm to a victim." 730 ILCS 5/3-6-3(a)(2)(iii); 3-6-3(a)(2.1); 5-4-1(c-1) (West 2010). The trial court did not make that finding. The State did not argue for that finding. Nor did the State present any evidence of the victims' injuries at the sentencing hearing. Rather, the State simply presented this outcome as a *fait accompli*: "85 percent on the sex case. 85 percent on the home invasion." That was not a fair statement of the law, but the trial court evidently followed it. As a result, defendant is serving his sentence at 85% rather than 50% time based on what appears to have been a simple misapprehension of the law.

¶ 170  At oral argument, the State conceded error. We appreciate and agree with that concession. Absent a finding of great bodily harm supported by the evidence, there was no basis for ordering that defendant serve his conviction for home invasion at 85% time. See *People v. Cunningham*, 365 Ill. App. 3d 991, 997 (2006).

¶ 171   We thus reverse the trial court's order that defendant's home-invasion sentence be served at 85% time, and we order that defendant shall be eligible for day-for-day credit on his sentence for home invasion.

¶ 172   In light of our disposition of this issue, we need not address defendant's argument that section 3-6-3(a)(2)(iii) of the Code of Corrections, which permits a judicial finding of great bodily harm without submission of the issue to the jury or proof beyond a reasonable doubt, is facially unconstitutional under *Alleyne*, 570 U.S. ___, 133 S. Ct. 2151, and *Apprendi*, 530 U.S. 466.

¶ 173                                         VII

¶ 174   Defendant was convicted of five counts of home invasion, two counts of armed robbery, and one count of aggravated criminal sexual assault. At sentencing, the trial court merged the home-invasion convictions together and merged the armed-robbery convictions together. The mittimus, however, lists five counts of home invasion and two counts of armed robbery.

¶ 175   The State concedes that defendant's mittimus should be corrected to reflect the court's oral pronouncement, which is controlling. *People v. Smith*, 242 Ill. App. 3d 399, 402 (1993). As to the home-invasion counts, we agree with defendant that judgment and sentence should be entered on count I, which was the most serious of those counts, because it sought an extended-term sentence on the ground that the victim (Khalil Jr.) was under 12 years old. See *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009) (most serious count, on which judgment and sentence should be entered, is count that carries highest maximum punishment); *People v. Morgan*, 385 Ill. App. 3d 771, 773 (2008) (home-invasion statute supports only single conviction for entry to residence, no matter how many victims). As to the armed-robbery counts, because the

punishments are identical and we cannot determine the more serious offense, we remand to the trial court to make that determination. See *In re Samantha V.*, 234 Ill. 2d at 379-80; *In re Rodney S.*, 402 Ill. App. 3d 272, 285 (2010).

¶ 176   Pursuant to Rule 615(b)(1), we direct the clerk of the circuit court of Cook County to correct the mittimus as we have specified regarding the home-invasion convictions. We remand to the trial court to determine which of the armed-robbery convictions should be included in the mittimus.

¶ 177                                        CONCLUSION

¶ 178   For the foregoing reasons, we hold that defendant is eligible to receive day-for-day good-time credit on his home-invasion sentence. We therefore reverse the trial court's order requiring defendant to serve that sentence at 85% time. We remand to the trial court for a determination of which armed robbery conviction should be included in the mittimus. We also direct the clerk of the circuit court of Cook County to correct the mittimus as we have specified. We otherwise affirm defendant's convictions and sentences.

¶ 179   Affirmed in part; reversed in part; remanded.