2025 IL App (2d) 240171-U
No. 2-24-0171
Order filed March 31, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-3323 |
| JUSTIN CAVAZOS, | ) ) ) | Honorable Elizabeth K. Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's second-stage dismissal of defendant's postconviction petition was not errorneous, because, where the argument would not likely have succeeded, appellate counsel was not ineffective for failing to argue on direct appeal that the evidence was insufficient to sustain defendant's attempted first degree murder conviction. In addition, defendant's argument, raised for the first time in this appeal, that he was denied a fair trial, where the pattern jury instruction on attempted murder likely confused the jury and caused it to convict him based on a misunderstanding of the law, is forfeited and, in any event, fails. Affirmed.

¶ 2     Defendant, Justin Cavazos, appeals the trial court's decision, granting the State's motion to dismiss his amended petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Defendant argues that he received ineffective assistance from

appellate counsel, where counsel did not argue on direct appeal that the evidence was insufficient to sustain his conviction for attempted first degree murder. Alternatively, defendant argues for the first time in this appeal that he was denied a fair trial, where the pattern attempted-murder jury instruction likely confused the jury and caused it to convict him based on a misunderstanding of the law. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Charges and Trial

¶ 5      On January 20, 2007, 15-year-old Oscar Rodriguez and his girlfriend, Claudia Lozano, were walking along High Street near Grove Street in Aurora. Gunshots were fired from a passing sports utility vehicle (SUV), killing Rodriguez and injuring Lozano. Defendant, Justin Cavazos (age 16 when the shooting occurred), and his brother, Joshua Cavazos (age 17 when the shooting occurred), were charged in connection with the incident. Specifically, on December 31, 2008, the grand jury charged defendant with first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2006)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)). Further, defendant was charged with attempted first degree murder (*id.* §§ 5/8-4(a), 5/9-1(a)(1)) in that he, "without lawful justification and with the intent to kill Claudia Lozano, shot at Claudia Lozano with a firearm."

¶ 6      In 2011, the brothers were tried simultaneously but by separate juries. At the beginning of jury selection in defendant's case, the trial court informed the jury that defendant was charged with the murder of Rodriguez and the attempted murder of Lozano. In its opening statement to defendant's jury, the State argued, in part, that defendant's motive for the shootings was to "hunt" and hurt rival gang members.

¶ 7    Lozano testified that, on January 20, 2007, she and Rodriguez were in the ninth grade. At around 2 p.m., they were walking down the sidewalk on High Street in Aurora. Rodriguez was closer to the street. An SUV drove by, and passengers started "throwing" gang signs and yelling gang slogans at Lozano and Rodriguez. Rodriguez responded, "King love." The SUV passed Rodriguez and Lozano, but it did a quick U-turn and, when it returned, Lozano heard four or five gunshots come from the SUV. She and Rodriguez fell to the ground. Lozano was hit by a bullet on her left thigh. Rodriguez died from multiple gunshot wounds.

¶ 8    David Hernandez testified that, in 2007, he, defendant, and Joshua were members of the Insane Deuces street gang, as was Jaime Barragan. The gang members would often stay at Manny Caranza's apartment in Aurora. Caranza, also an Insane Deuces member, kept firearms, including .40-caliber weapons, in his apartment. The guns, known as "nation guns," belonged to the gang and were available for any gang member to use when "hunting" (*i.e.*, looking for rival gang members to shoot). At the time of the shooting, the Insane Deuces and the Latin Kings were rivals, and the area of High and Grove Streets in Aurora was known Latin Kings territory. Generally, "hunting" would be the only purpose for Insane Deuces members to enter that area.

¶ 9    On January 19, 2007, Hernandez, Barragan, and both Cavazos brothers were at Caranza's apartment, where they stayed overnight. At some point, defendant, Joshua, and Barragan, who had been having a conversation in the kitchen, entered the living room and told Hernandez to come with them. The four men got into the SUV that Hernandez and Carragan stole the night before. They went "hunting" in Latin Kings territory. On High Street, they saw a "rival gang banger" walking with someone else. The male pedestrian was closer to the street. When asked if the "gang banger" was a "he" or a "she," Hernandez replied, "he." When asked how he knew that "he" was a rival gang member, Hernandez explained that he was wearing Latin Kings colors and threw a

Latin Kings crown signal. The SUV drove past the pedestrians, turned around, and came back toward "him." Defendant handed Hernandez a .40-caliber semiautomatic handgun. Hernandez looked at the gun, held it for a second, and refused to pull the trigger. He passed the gun back to defendant. Defendant then passed the gun up front to Joshua. Joshua aimed the firearm out the window and shot three or four rounds.

¶ 10 Barragan testified that, on the morning of January 20, 2007, Joshua told defendant and Barragan that he wanted to "put in work." According to Barragan, "putting in work" means shooting someone. They were in a bedroom, and Hernandez was in the living room. Defendant showed Barragan and Joshua that he had a gun—specifically, a .40-caliber semiautomatic firearm—and said that "that's the gun they want to put in work with." Barragan explained that he drove the SUV and, on High Street, they saw a boy and a girl walking down a sidewalk, the boy was closer to the street, and defendant started "gang banging with the boy." Barragan saw defendant pass Hernandez some gloves and the gun he had displayed earlier in the apartment. When he turned the car around, the boy and the girl were "walking like right next to each other," with the boy closer to the street. According to Barragan, Hernandez said that he "wasn't doing it" and passed the gun to Joshua between Joshua's seatbelt and the passenger door. Barragan saw Joshua with the gun; Joshua started shooting, and Barragan heard three to five gunshots. They returned to Caranza's apartment, where Joshua and defendant bragged about the shooting. In addition, defendant had earlier bragged about the shooting, saying, "we just handled business," which, in gang terms, meant that they shot somebody.

¶ 11 Barragan was asked, "[B]etween the boy and the girl, which was significant to you?" He replied, "[T]he boy." Asked, "I mean, were you targeting the girl at all?" He answered, "[U]m." Then, "[Y]ou were worried about the boy, right?" Answer, "[Y]es, sir." He confirmed that the

girl neither threw up the crown nor did anything else. They were talking about the boy while Barragan drove by, and Barragan testified that "the girl" (presumably, harming her) would not give him any rank in the gang. After they turned around and returned toward the pedestrians, the boy walked toward the car while the girl was on the sidewalk; she did not come toward the car. When the boy was shot, the girl was on the sidewalk. Barragan did not see the gun pointed at her.

¶ 12 Ignacio Rios testified that, on January 20, 2007, he was a member of the Insane Deuces and was at Caranza's apartment. Rios had a conversation with defendant, Joshua, Hernandez, and Barragan. Defendant displayed a .40-caliber silver semiautomatic handgun. Barragan and defendant spoke about finding a Latin Kings member to shoot. Defendant, Joshua, Hernandez, and Barragan left the apartment, and Rios stayed in the apartment with Caranza. Later, when the four men returned to the apartment, Joshua acted happy because he just "whacked a King," and defendant acted excited and threw up the crown and kissed it like he did when he was false flagging.

¶ 13 Prior to trial, the court granted the State's motion *in limine* to admit, pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), evidence of a subsequent crime. Specifically, the State introduced evidence that, after the shooting, defendant committed another attempted murder, wherein another Insane Deuces gang member supplied a "nation gun" to defendant, who again drove by people on a sidewalk in Aurora and targeted Latin Kings.

¶ 14 Gang expert Sergeant Jeffrey Wiencek explained that, to protect gang territory, members acquire guns and go "hunting" for rivals. "Hunting" is actively searching for rival gang members to hurt or kill. When asked if he had any doubt that defendant was an Insane Deuces member, Wiencek replied, "none."

¶ 15    The parties made closing arguments to defendant's jury.  The State argued that defendant's intent was to hunt, identify, and hurt a rival gang member and to "[p]ut that weapon in the hands of another person so that they could take the life of another individual."  The State argued that, even though he did not fire the gun, defendant was accountable and responsible for the actions of the shooter.  The State reviewed the accountability instruction with the jury:

> "a person is legally responsible for the conduct of another person when, either before or during the commission of the offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

Further, it noted that "intent to promote or facilitate the commission of an offense may be shown by evidence the defendant shared a criminal intent of the principal or evidence that there was a common criminal design."  Here, the State argued, the common criminal design was to go hunt and shoot rival gang members, an intent reflected by defendant's conversations in Caranza's apartment; his display of a handgun; his decision to bring the handgun into the SUV; and his decision, *after* he spotted Rodriguez and Lozano walking together, to begin "gang-banging" with Rodriguez to "help the common purpose and design" of identifying a rival gang member and target.  Then, to "aid, abet, solicit the other people in the car in the commission of this crime," defendant supplied the gun and gloves to Hernandez and Joshua.   The State argued that the inescapable conclusion was that, when defendant provided the gun and it was used to fire four times at Rodriguez and Lozano, they were using it "to kill someone, to hunt another gang member."  As to Lozano, she was shot and "she's standing right next to [Rodriguez].  She's standing right there. Why?  There's no rhyme or reason.  *** but the intent was there.  The intent to kill was there.  In the intent to kill an individual, Claudia Lozano was struck."

¶ 16    Defense counsel argued in closing that the important question in defendant's case was whether the evidence proved beyond a reasonable doubt that "[defendant] took part in this, that [defendant] was in that car? *** What is the evidence beyond a reasonable doubt that [defendant] was actually in that car?" Further, counsel argued that the subsequent-crime evidence, which the State asserted was relevant to motive and intent, was irrelevant, because, "[i]f you believe [defendant's] in the car in the first place, then you already have motive and intent established by every other gang member and gang evidence that came in." Counsel argued to the jury that defendant was not guilty of attempted murder, because the evidence did not illustrate the requisite intent to kill Lozano. Counsel asked the jury, "when was [Lozano] the subject of anything? When did they say, 'Hey, let's get her. We'll get rank or business', or whatever the silly goal is of this gang[?]" He argued that an intent to hurt one person, which then hurt someone else, reflected, in these circumstances, not attempted murder but, instead, merely aggravated discharge of a firearm. Counsel also explained that the phrase "an individual" in the attempted-murder instruction was *not* referring to Rodriguez, who was the subject of the murder instruction. Counsel continued that, while he and the jurors could agree that they did not like what happened to Lozano, that alone did not establish an intent to murder her, and he referred the jury to the autopsy report to argue that Lozano was hit by a bullet that went through Rodriguez and struck her. "You know, does that mean someone was aiming the gun at [Lozano] with a plan or intent to kill her? No."

¶ 17    With no objection, the jury in defendant's case was provided two pattern instructions related to attempted murder. The first stated, in relevant part, "[a] person commits the offense of attempt first degree murder when he, without lawful justification and with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual." Illinois Pattern Jury Instructions, Criminal, No. 6.05X (4th ed. 2000). The second instruction

provided, in relevant part, that, to sustain the charge of attempted first degree murder, the State needed to prove that defendant, "or one for whose conduct he is legally responsible": (1) "performed an act which constituted a substantial step toward the killing of an individual"; and (2) "did so with the intent to kill an individual." Illinois Pattern Jury Instructions, Criminal, No. 6.07X (4th ed. 2000).

¶ 18      In contrast, for first degree murder, the jury was instructed that it had to find that defendant, or one for whose conduct he was legally responsible, performed the acts "which caused the death of Oscar Rodriguez."

¶ 19      Defendant's jury convicted him of two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2006)), attempted first degree murder (*id.* §§ 5/8-4(a), 5/9-1(a)(1)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)). Further, as to the first degree murder and attempted-murder convictions, the jury found that defendant, or one for whose conduct he was responsible, committed the crimes while armed with a firearm, thus, subjecting him to mandatory sentencing enhancements (730 ILCS 5/5-8-1(a)(1)(d) (West 2006)). The trial court denied defendant's posttrial motions and sentenced him to an aggregate of 60 years' imprisonment.

¶ 20                              B. Direct Appeals

¶ 21                              i. Defendant's Appeals

¶ 22      On appeal, this court rejected defendant's arguments concerning the admissibility of subsequent bad act evidence and gang expert testimony, as well as the constitutionality of his sentence. *People v. Cavazos*, 2015 IL App (2d) 120444.

¶ 23      Later, the case returned to us following our supreme court's entry of a supervisory order, directing us to vacate our prior judgment, consider the effect of *People v. Buffer*, 2019 IL 122327,

on the issue of whether defendant's sentence constituted an unconstitutional *de facto* life sentence and to determine if a different result was warranted. *People v. Cavazos*, No. 119139 (Ill. Nov. 24, 2021) (supervisory order). However, defendant also filed an unopposed motion, asking that we dismiss as moot his sentencing argument, since the State had agreed in postconviction proceedings that he should receive a new sentencing hearing. Accordingly, we affirmed defendant's conviction and dismissed as moot his sentencing arguments. *People v. Cavazos*, 2022 IL App (2d) 120444-B.

¶ 24    On March 18, 2022, defendant received a new sentencing hearing, and the trial court imposed a 41-year aggregate sentence. This court affirmed. *People v. Cavazos*, 2023 IL App (2d) 220182-U, ¶ 5.

¶ 25                              ii. Joshua's 2015 Direct Appeal

¶ 26    Separately, as it is relevant to defendant's arguments in this appeal, we note that Joshua raised numerous issues in his direct appeal, including that (1) the jury was improperly instructed on the attempted-murder charge, where the instruction did not state that, to be found guilty, he had to specifically intend to kill Lozano, as opposed to merely "an individual"; and (2) the attempted-murder conviction must be reversed because no evidence established that he specifically intended to kill Lozano. *People v. Cavazos*, 2015 IL App (2d) 120171, ¶ 3. In rejecting his arguments, we noted that, in closing arguments to Joshua's jury, the State emphasized that the wording of each jury instruction was important and, as to attempted murder,

> "the evidence we've already talked about supports the attempted murder as well. The defendant fired shots in the direction of both [Rodriguez] and [Lozano]. He had specific intent to kill both. He successfully completed the killing of [Rodriguez]. He did not successfully complete the killing of [Lozano]. He took a substantial step though by

shooting and by hitting her with the bullet on her thigh. Although she was not seriously injured, we know from the facts that the defendant tried to kill her as well." *Id.* ¶ 55. We held that the record belied Joshua's assertion that there was a serious risk that the attempted-murder instruction misled the jury, such that it convicted Joshua based on a misunderstanding of the law. *Id.* ¶¶ 80-81. We found confusion not probable, where

> "Lozano testified that she was next to Rodriguez when he was shot and that she was shot in the leg. There were only two people on the sidewalk when Joshua opened fire: one died, and one was injured. *** [W]e do not believe that the evidence could have confused the jury as to who was the subject of the attempted-murder charge such that the trial court erred by not deviating from the pattern instruction. Again, the court should deviate from the pattern instruction only where necessary to conform to unusual facts or new law. We disagree that either existed here." *Id.* ¶ 80.

¶ 27 Further, we rejected Joshua's argument that the evidence failed to establish that he specifically intended to kill Lozano, such that the attempted-murder conviction could not stand. As defendant raises similar arguments on appeal here and references our holding in Joshua's appeal, we quote at length our former decision, to give context to our statements therein. Specifically, we wrote:

> "Joshua argues that attempted murder is a specific-intent crime but that the only evidence presented reflected an intent to kill a rival gang member and, specifically, 'the boy' who was wearing gang colors and returned the Latin King[s] sign. Further, he argues that we should find that the doctrine of transferred intent does not apply and therefore cannot cure the State's lack of evidence regarding a specific intent to kill Lozano. Joshua concludes that the evidence supported only that his knowing discharge of a firearm in

Lozano's direction constituted aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)), of which the jury also found him guilty.

Preliminarily, we agree with the State that the doctrine of transferred intent is not at issue here and, therefore, we need not resolve its applicability to inchoate offenses. Transferred intent generally concerns an *unintended* victim, such that the actor's intent to injure or kill one person may be transferred to a different victim who was injured or killed. See *People v. Migliore*, 170 Ill. App. 3d 581, 589 (1988). Here, the State did not pursue a theory at trial that Joshua's intent to kill Rodriguez transferred to Lozano, who was an unintended victim. Rather, the State maintained that Joshua *also* intended to kill Lozano. The question is simply whether the evidence was sufficient for the jury to find, beyond a reasonable doubt, that Joshua *also* intended to kill Lozano.

Joshua's argument regarding transferred intent is premised on his belief that there was no evidence that he intended to kill Lozano (such that, he concludes, he was convicted by virtue of transferred intent only). However, we disagree with his premise. It is fair to say that the evidence speaking to Joshua's intent to kill Lozano was not as detailed as that supporting his intent to kill Rodriguez. As Joshua points out, the witnesses testified that they were 'hunting,' looking to shoot a rival gang member. They testified that the rival gang member they found was a 'he' and that 'he' was walking with a girl. Rodriguez was the person wearing gang colors and who returned the gang sign, signifying himself as a Latin King. Barragan testified that [defendant] was 'gang banging with the boy' and that he intended to get out of the car to beat up 'the guy.' Further, according to Barragan, between the boy and the girl, the boy was the one who was significant, and harming the girl would not necessarily provide any clear reward within the gang in terms of rank or

otherwise. Barragan did not see the gun pointed at Lozano, and he testified that, when Rodriguez was shot, he was closer to the street and Lozano was still on the sidewalk." (Emphases in original.) *Cavazos*, 2015 IL App (2d) 120171, ¶¶ 84-86.

¶ 28    However, we noted that the standard of review required us to consider the evidence in the light most favorable to the State, as well as the fact that intent to kill is rarely demonstrable through direct evidence and may, therefore, be inferred from surrounding circumstances. *Id.* ¶ 88. Accordingly, we concluded that the evidence was clearly sufficient to establish Joshua's intent to kill Lozano. Specifically, we explained,

"Here, although the evidence speaks more directly to Joshua's intent to kill Rodriguez, there nevertheless clearly exists sufficient evidence from which the jury could have reasonably found that Joshua also intended to kill Lozano. Again, the jury heard evidence regarding the circumstances of the shooting, which included that the vehicle drove up close to the victims, who were walking right next to each other, and that Joshua fired at least four rounds from a .40-caliber semiautomatic weapon. See [*People v.*] *Teague*, 2013 IL App (1st) 110349, ¶ 25 (evidence of intent to kill sufficient where the defendant fired, from a distance of 40 feet, a semiautomatic weapon at three police officers sitting in a vehicle, even though there was no damage to the vehicle except the windshield and no officer was injured). Thus, the evidence reflects that Joshua pointed the gun in the direction of two people standing together and fired four shots at relatively close range. Lozano was, in fact, shot in the leg. 'The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' (Internal quotation marks omitted.) *Teague*, 2013 IL App (1st) 110349, ¶ 2 (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)); see also *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011)

(intent to kill reasonably inferred from firing two bullets in the direction of an occupied car and crowded street); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (intent to kill reasonably inferred from shooting down a breezeway in which several people were running).

Further, there exists other evidence in the record from which the jury could have found an intent to kill Lozano or, at least, from which it could have discounted testimony suggesting that she was not a target. For example, although Barragan testified that he did not see the gun aimed at Lozano, he also testified that the gunshots surprised him and he was focused on driving away 'recklessly.' Although Barragan claimed that, during the shooting, Rodriguez had stepped forward toward the SUV and Lozano was still on the sidewalk, Hernandez testified that, after the car returned and approached them, Rodriguez and Lozano were 'walking like right next to each other.' Thus, the jury could have resolved any discrepancies in the testimony by crediting that which reflected an intent to kill Lozano, as well as Rodriguez. In sum, we conclude that the jury could have reasonably found that, based on the circumstances of the shooting, Joshua intended to kill Lozano. Thus, Joshua's argument fails." *Id.* ¶¶ 89-90.

¶ 29                                C. Postconviction Proceedings

¶ 30    Defendant petitioned for postconviction relief. In an amended petition, filed with the assistance of counsel, defendant argued, among other things, that his appellate counsel was ineffective for failing to raise an argument on direct appeal that the State had not proved him guilty of attempted murder. He argued that the evidence showed only an intent to shoot a rival gang member, not a specific intent to kill Lozano.

¶ 31　In response, the State argued that defendant's argument lacked credibility and an understanding of law, because to prove the specific intent necessary for attempted first degree murder, the State did not necessarily have to prove a specific intent to kill "the victim." It referenced the pattern jury instructions, which explained it was necessary only that the defendant have an intent to kill "an individual." In addition, the State noted that defendant did not challenge the proof of intent to kill Rodriguez and ignored the legal theory of transferred intent, which established, with each shot fired, an intent to kill Rodriguez legally transferred to Lozano.

¶ 32　On February 9, 2024, the trial court granted the State's motion to dismiss. As to defendant's claim that appellate counsel was ineffective for failing to argue on direct appeal that the State had not proved him guilty of attempted first degree murder, the court found,

> "the [State's] argument that the only requirement of the State at trial was to prove [defendant's] specific intent to kill an individual, using the theory of transferred intent in Illinois, to be a correct statement of the law as evidenced by the Illinois Pattern Jury Instructions and the cases cited in the [State's] motion to dismiss."

¶ 33　Defendant appeals.

¶ 34　　　　　　　　　　　　　　II. ANALYSIS

¶ 35　The Act "provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in [his or her] original trial or sentencing hearing." *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). The Act establishes a three-stage process for the adjudication of a postconviction petition and, at the second stage of proceedings, as here, counsel for the defendant may be appointed under section 122-4 of the Act. 725 ILCS 5/122-4 (West 2016). The State may then answer or move to dismiss the postconviction petition. *Id.* § 122-5. The relevant inquiry at the second stage is "whether the petition and any accompanying

documentation make a substantial showing of a constitutional violation." *People v. Johnson*, 2018 IL 122227, ¶ 15. A substantial showing is made when the petition's allegations, if proven at an evidentiary hearing, would entitle the defendant to relief. *People v. Moore*, 2023 IL App (1st) 220919, ¶ 25. The trial court does not engage in fact-finding or credibility determinations at the second stage of proceedings; rather, only the legal sufficiency of the petition is tested. *Id.* ¶ 27. Therefore, a motion to dismiss filed at the second stage raises the sole issue of whether the petition is proper as a matter of law and, if the petition fails to make a substantial showing of a constitutional violation, it is dismissed. *Id.* ¶¶ 26, 39.

¶ 36    Moreover, we note that the purpose of the Act is to allow inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal. *People v. English*, 2013 IL 112890, ¶ 22. As such, issues that could have been raised on direct appeal, but were not, are forfeited, although forfeiture may be relaxed where fundamental fairness so requires or where the forfeiture stems from the ineffective assistance of appellate counsel. *Id.*

¶ 37                    A. Ineffective Assistance of Appellate Counsel

¶ 38    Defendant argues first that his petition made a substantial showing of a constitutional violation because appellate counsel on direct appeal was ineffective. Specifically, defendant contends that the State did not pursue at trial a theory of transferred intent (*i.e.*, that the intent to kill Rodriguez was transferred to Lozano, who was "accidentally" hurt) and, further, the evidence demonstrated only an intent to kill a rival gang member, not specific intent to kill Lozano. Therefore, he argues that his appellate counsel should have argued on direct appeal that the evidence was insufficient to sustain his attempted-first-degree-murder conviction.

¶ 39     As to transferred intent, defendant elaborates that the postconviction court erred in agreeing with the State that defendant was accountable for Joshua's shooting of Lozano, based on the theory of transferred intent. He points out that this court held in Joshua's direct appeal that transferred intent has no application in the case. Therefore, defendant contends, because transferred intent did not apply, the court also erred in agreeing with the State that the jury was properly instructed that, to be guilty of attempted murder, defendant had to possess intent only that "an individual" be killed, an individual who did not necessarily have to be Lozano. Defendant argues that, where transferred intent did not apply to Joshua's shooting of Lozano, it cannot be the basis of his accountability conviction for the same shooting.

¶ 40     Therefore, defendant explains, the State needed to prove, but failed to do so, that he had the specific intent to kill Lozano. Rather, the State argued and the evidence established only that his "mission was to hunt and shoot a rival gang member." There was no evidence that he believed Lozano was in a rival gang, and the evidence reflected the "boy" was significant but the "girl" would not have earned them any rank or recognition within their gang. Defendant argues that we must conclude, based on the evidence and arguments presented at trial, that he did not have any intent to kill or injure Lozano and, consequently, could not be convicted for the offense of attempted first degree murder. Consequently, appellate counsel was ineffective because, had the sufficiency of evidence for the attempted murder been raised on direct appeal, it would likely have been successful. He therefore requests that we reverse outright his conviction for attempted first degree murder or, alternatively, vacate the dismissal order and remand the claim for additional postconviction proceedings.

¶ 41     To succeed on a claim of ineffective assistance of appellate counsel, a defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is

a reasonable probability that the appeal would have been successful. *English*, 2013 IL 112890, ¶ 33; see also *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). A reasonable probability is one sufficient to undermine confidence in the outcome. *People v. Moore*, 356 Ill. App. 3d 117, 121 (2005). Appellate counsel is not required to raise every issue on appeal and, where an appellate attorney presents one argument on appeal rather than another, a defendant must demonstrate that the issue not presented "was clearly stronger than the issues that counsel did not present." *English*, 2013 IL 112890, ¶¶ 33, 58 (Freeman, J., specially concurring); *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

¶ 42    Here, appellate counsel's decision to not pursue a sufficiency-of-the-evidence argument was not outside the wide range of reasonable professional assistance, nor did it prejudice defendant, because there is no reasonable probability that, if raised, it would have been successful. Indeed, given our holding rejecting that argument in Joshua's case, it is almost puzzling that defendant would suggest that, if his appellate counsel had raised the argument on appeal, it likely would have been successful. As noted, Joshua raised an almost identical argument that, because the evidence reflected only an intent to hunt or hurt a rival gang member, the evidence did not suffice to support an intent to kill Lozano, and this court *rejected* that argument. *Cavazos*, 2015 IL App (2d) 120171, ¶¶ 86-89. Defendant, therefore, hangs his hat on our statement that transferred intent was not the theory the State pursued in Joshua's case and did not apply (*id.* ¶ 85), such that, he contends, the postconviction court's decision that transferred intent applied to *him* on an accountability theory was erroneous. He notes this case is different than *People v. Hill*, 276 Ill. App. 3d 683, 687-89 (1995), or *People v. Barrage*, 269 Ill. App. 3d 67, 76 (1994), where attempted-murder convictions were properly sustained on a theory of transferred intent, but where that theory applied to *both* the principals and accomplices. In contrast, he contends, it would be

unjust to find that the State here sufficiently established his guilt for murder *and* attempted murder, based on his intent to harm *only* Rodriguez, where, for Joshua, the principal, the State was required to establish the intent to kill *both* Rodriguez and, separately, Lozano. For the following reasons, we reject defendant's arguments.

¶ 43 Preliminarily, we remain mindful that, while they had a shared trial, defendant and Joshua had separate juries and different arguments were made (indeed, by different attorneys for both defendants and the State) to their respective juries. As such, defendant is incorrect that our conclusion that the State did not pursue a transferred-intent theory in Joshua's case would *necessarily* require us to make the same conclusion here. In any event, although defendant contends it is unjust that he could be convicted based on transferred intent when that theory did not apply to Joshua, transferred intent is simply not necessary to sustain defendant's attempted-murder conviction on an accountability theory. Indeed, we conclude, like we did in Joshua's case, that defendant's conviction may be sustained without relying on transferred intent; in other words, the "higher burden" he notes we found satisfied for Joshua was *also* satisfied in defendant's case.

¶ 44 Specifically, as the State argues on appeal, transferred intent is not necessary to sustain defendant's conviction, so long as a reasonable jury could find that the evidence established beyond a reasonable doubt that defendant *either* shared Joshua's intent *or* there was a common criminal design. Indeed, the State argued to defendant's jury that, for purposes of accountability, defendant could be found liable if *either* he shared the criminal intent of the principal, *i.e.*, Joshua, *or* through evidence that there was a common criminal design. The State contends that defendant's sufficiency-of-the-evidence argument would not have succeeded, and the ineffective-assistance claim fails, because his participation rendered him criminally liable for Joshua's acts, given the existence of a common criminal design. We agree with the State.

¶ 45     We note that, although defendant suggests that the State has abandoned its claim that transferred intent applied, such that it is tacitly admitting that the postconviction court erred in granting the motion to dismiss on that basis, we disagree. Although the State does not argue on appeal that transferred intent applies, we read the State's argument not so much as an admission as, instead, a decision to point out that it is not needed and alternative bases support the conviction and, thus, the court's dismissal of the petition. And, regardless of the State's argument or the rationale for the court's dismissal, *this court* may affirm for *any* basis supported by the record.[1] *People v. Gomez*, 2021 IL App (1st) 192020, ¶ 65 ("it is well settled that this court may affirm the circuit court's judgment on any basis appearing in the record, whether or not the circuit court relied on that basis or whether or not the circuit court's ruling was correct"); *People v. Olsson*, 2015 IL App (2d) 140955, ¶ 17 ("[w]e review the trial court's judgment rather than its reasoning, and we may affirm on any basis supported by the record"). Further, when reviewing a challenge to the sufficiency of evidence on appeal, this court must decide whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Pollack*, 202 Ill. 2d 189, 217 (2002). In doing so, all reasonable inferences are drawn "in favor of a finding of guilt," and, as it is the trier of fact who "determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence," and the trier of fact's credibility determinations are entitled to great weight. *People v. Baker*, 2022

---

[1]For this reason, defendant's suggestion in his appellate brief that postconviction counsel provided unreasonable assistance where counsel might have implied that he understood that transferred intent applied, fails, because, again, the petition was properly dismissed regardless of whether transferred intent applied.

IL App (4th) 210713, ¶¶ 34-35. In that regard, we conclude that, viewed in the light most favorable to the State, a rationale jury could have found beyond a reasonable doubt that defendant *both* shared Joshua's intent and that there was a common criminal design. See *Baker*, 2022 IL App (4th) 210713, ¶ 39 (rejecting the defendant's argument that only a shared-intent theory of accountability, not the common-design theory, was pursued by the State, and concluding that the evidence was sufficient to support the defendant's conviction under both theories).

¶ 46 Again, we previously held that, despite the evidence establishing the goal of hunting a rival gang member and the lack of evidence reflecting that the group believed Lozano was a rival gang member, the evidence nevertheless sufficed to establish that Joshua intended to kill her. *Cavazos*, 2015 IL App (2d) 120171, ¶ 89. We noted, in part, that he fired four shots at two people walking right *next* to each other. *Id*. For the same reasons, the jury could have reasonably found evidence reflecting that defendant shared Joshua's intent and knew Joshua intended to murder both people. For example, defendant proceeded to "gang bang" with Rodriguez even *after* noticing that Lozano was right next to him. The evidence did not reflect, for example, that defendant hesitated or refrained from gang banging, when he noticed Lozano's presence. Similarly, the evidence reflected that, after seeing Rodriguez return a gang slogan, and despite Lozano's presence right next to him, defendant handed the gun to Hernandez and, then, purportedly to Joshua. Again, nothing in the record suggested that defendant was reluctant to give up the weapon out of concern that Lozano, too, would be murdered. Rather, two people, not one, became the targets of the hunt and resultant gunfire. "A defendant's mental state is ordinarily proved circumstantially by inferences reasonably drawn from the evidence." (Internal quotation marks omitted.) *People v. Grimes*, 386 Ill. App. 3d 448, 455 (2008). "Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense." *People*

*v. Perez*, 189 Ill. 2d 254, 266 (2000). Here, a reasonable jury viewing the evidence in the light most favorable to the State could have found the evidence sufficient to establish that, under these circumstances, defendant, who, despite Lozano's presence, proceeded to gang bang and produce the weapon, shared Joshua's specific intent to also murder Lozano.

¶ 47    Similarly, we also agree with the State that the evidence was sufficient for a reasonable jury to find the existence of a common criminal design to murder Lozano. Common criminal design establishes intent by proving a defendant's participation in the offense. See, *e.g.*, *People v. Fernandez*, 2014 IL 115527, ¶ 19 ("[e]vidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." (Internal quotation marks omitted.)); 720 ILCS 5/5-2(c) (West 2008) ("[w]hen 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts"). Indeed, "there is no question that one can be held accountable for a crime other than the one that was planned or intended, provided it was committed in furtherance of the crime that *was* planned or intended." (Emphasis in original.) *Fernandez*, 2014 IL 115527, ¶ 19. Importantly, "the offense which a defendant may intend to 'promote' or 'facilitate' need not be the offense for which he is convicted by accountability." *People v. Cole*, 253 Ill. App. 3d 603, 609 (1993). Rather, "all that is required for a defendant to be legally accountable in a common-design case is for the evidence to show that (1) the group was intending to engage in some form of criminal behavior and (2) the defendant was aware of the group's intentions." *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 49. "[N]othing more specific is required." *Id.* And, "[o]nce the evidence shows that a defendant

has voluntarily attached himself to a group bent on illegal activities with knowledge of its design, the only question remaining is whether the evidence shows *any* criminal act was done by *any* member of the group in furtherance of the group's common design." (Emphasis in original.) *Id.* ¶ 63.

¶ 48    Defendant, nevertheless, argues that the *only* crime intended by common design was to shoot a rival gang member and that Lozano's shooting was *not* in furtherance of that common criminal purpose. He contends that his awareness of the group's intent to engage in criminal behavior was, therefore, limited to shooting a rival gang member, not shooting Lozano. Defendant further argues that the evidence simply does not support that shooting Lozano was in furtherance of the common design to kill a rival gang member, as the evidence reflects she was not the person closest to the street or between the SUV and Rodriguez, such that she necessarily had to be shot in order to accomplish the killing of Rodriguez. Indeed, he notes, the bullet apparently struck Lozano *after* going through Rodriguez. Thus, he contends that Joshua decided at the last minute to shoot both a rival gang member and his companion, reflecting he engaged in two separate acts, not a shooting of Lozano in furtherance of the plan to shoot Rodriguez. Again, we disagree.

¶ 49    We find defendant's reliance on *People v. James*, 2017 IL App (1st) 143391, unpersuasive. There, defendant notes, a defendant was accountable for a robbery but *not* for the principal's decision to commit sexual assault to an occupant in the home, because, where it was not committed in *furtherance* of the robbery, there was no common-design accountability for the sexual assault. *Id.* ¶¶ 47-51. However, we note that the defendant in *James* nevertheless remained guilty of sexual assault because he *assisted* in the sexual assault and, thus, the court found that a *second* common design arose to sexually assault the victim. *Id.* ¶¶ 47, 52-57. Here, a reasonable jury could have found from the evidence that defendant assisted and participated in a common design to shoot *both*

Rodriguez and Lozano.[2] Defendant exchanged gang slogans with Rodriguez when Lozano was right beside him, and he passed along a gun to accomplish the shootings. Again, unlike two different crimes like sexual assault and robbery, the group here worked together to fire four gunshots at two young people walking *right next to each other*. As the State argued to the jury in closing, intent to kill is the inescapable conclusion when defendant produced a gun used to fire four times at Rodriguez and Lozano, who was "standing right next to [Rodriguez]. She's standing right there. *** [T]he intent was there. The intent to kill was there. In the intent to kill an individual, Claudia Lozano was struck." The evidence sufficed to establish that, in furtherance of their goal to shoot and kill a rival gang member, four shots were fired at two people standing next to one another, reflecting a willingness to kill Lozano, too, if it meant killing Rodriguez. Defendant and his group intended to kill a gang member, as well as Lozano, to effectuate that plan. Again, proof of intent is often circumstantial. See *e.g.*, *Teague*, 2013 IL App (1st) 110349, ¶ 88; *James*, 2017 IL App (1st) 143391, ¶ 56 ("a common purpose or design sufficient for accountability may be inferred from the circumstances of a defendant's conduct."). As such, the jury could have reasonably found beyond a reasonable doubt that the attempted murder of Lozano was committed in furtherance of the planned and intended act of shooting Rodriguez, the rival gang member.

¶ 50    Finally, we must point out that the jury flatly rejected the argument that the State failed to prove intent for attempted murder. Defense counsel argued to the jury that defendant was not

---

[2]Indeed, similar to the facts in *James*, we think an argument could also be made that, while the original common design might have been to hunt and shoot only a rival gang member, a jury could have found a second common design arose, namely, to shoot both Rodriguez and Lozano, as evidenced by the group proceeding with the shooting *after* having seen both individuals right next to each other on the sidewalk.

guilty of attempted murder because the evidence did not illustrate the requisite intent to kill Lozano. Again, counsel asked the jury, "when was [Lozano] the subject of anything? When did they say, 'Hey, let's get her. We'll get rank or business', or whatever the silly goal is of this gang[?]" He argued that, in these circumstances, an intent to hurt one person, which then hurt someone else, was not attempted murder but, instead, only aggravated discharge of a firearm. Counsel continued that, while what happened to Lozano was unfortunate, he questioned whether it established an intent to murder her, and he referred the jury to the autopsy report to argue that Lozano was hit by a bullet that went through Rodriguez and struck her. "You know, does that mean someone was aiming the gun at [Lozano] with a plan or intent to kill her? No." Accordingly, the jury clearly and reasonably, given the evidence, did not find that argument credible and *rejected* that the evidence was insufficient to establish an intent to kill Lozano. See *Baker*, 2022 IL App (4th) 210713, ¶ 35 (a jury's credibility findings are given great weight). On appeal, therefore, viewing the evidence in the State's favor, appellate counsel would not have faced a reasonable probability of success, had he argued that no rational jury could have found an intent to kill Lozano. See *Pollack*, 202 Ill. 2d at 217.

¶ 51    In sum, we have discussed multiple theories upon which the jury could have reasonably found defendant accountable for the attempted first degree murder of Lozano. Although some of those theories, such as defendant sharing Joshua's intent or the development of a second common design, were not advocated by the State in the motion to dismiss or on appeal, we note, as did the court in *James*, that it is "of no import that the theory of accountability on which we affirm defendant's conviction is not the one the State urges on appeal. We are not bound by a party's particular argument or concession on appeal." *James*, 2017 IL App (1st) 143391, ¶ 60. And, of course, we also agree with the State's argument regarding accountability through common design.

In short, defendant's ineffective-assistance argument requires us to review the judgment and ask whether a properly instructed jury could have rationally found defendant guilty beyond a reasonable doubt and, as the court noted in *James*, "[t]he jury was not required to accept any particular theory of the prosecution. As long as it was properly instructed (it was), and the evidence, taken in the light most favorable to the State, supports its verdict (it does), we will affirm that judgment." *Id.*

¶ 52    Here, we have concluded that the jury could have reasonably found beyond a reasonable doubt that defendant was guilty of attempted murder. Accordingly, appellate counsel's failure to raise on direct appeal an argument challenging the sufficiency of the evidence sustaining the attempted-murder conviction did not prejudice defendant, because there was no reasonable probability of success. Therefore, his ineffective-assistance claim failed to make a substantial showing of a constitutional violation, and the postconviction court did not err in granting the State's motion to dismiss the amended petition.

¶ 53                                B. Jury Instructions

¶ 54    Alternatively, defendant argues that the unmodified attempted-murder jury instruction likely confused the jury and caused it to convict him based on a misunderstanding of the law; namely, an incorrect belief that he did not have to intend that Lozano be killed. He contends that the pattern instruction, stating that he needed an intent to kill only "an individual," denied him a fair trial because, while the evidence showed he had the intent to kill Rodriguez, it did not show he had the intent to kill Lozano. As such, defendant argues, the jury might have been confused and believed that, to be guilty of attempted murder, he needed an intent to kill only Rodriguez. Because this case presented unusual facts, defendant argues that the pattern instruction should have been modified to more accurately state the law and reflect that the State had to prove that defendant

intended to kill Lozano. Defendant acknowledges that this argument was not raised at trial, on direct appeal, or in his postconviction petition. Therefore, he alleges ineffective assistance was provided by trial and appellate counsel and unreasonable assistance was provided by postconviction counsel. Defendant requests that we remand for a new trial or for new, second-stage postconviction proceedings.

¶ 55    Defendant has clearly forfeited this issue on multiple occasions. Postconviction proceedings are not meant to address issues that could have been, but were not, raised earlier; any such issues are forfeited. *English*, 2013 IL 112890, ¶ 22. Nevertheless, because forfeiture may be relaxed where fundamental fairness so requires or where the forfeiture stems from the ineffective assistance of counsel, defendant frames his issue as one of ineffective assistance. As previously explained, to succeed on a claim of ineffective assistance of trial or appellate counsel, a defendant must show both that counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* ¶ 33. A reasonable probability is one sufficient to undermine confidence in the outcome. *Moore*, 356 Ill. App. 3d at 121. Postconviction counsel, however, is required to provide a defendant with a reasonable level of assistance. *People v. Suarez*, 224 Ill. 2d 37, 42 (2007).

¶ 56    We note first that, to the extent that defendant's argument is premised on his contention that the evidence demonstrating his intent to kill Lozano was lacking, we rejected that argument above. Moreover, as to any serious risk of the jury being confused regarding whether the attempted-murder instruction's reference to "an individual" pertained to Rodriguez, as opposed to Lozano, the record rebuts any such likelihood. Although defense counsel did not object to the attempted-murder instruction, he explained to the jury that the phrase "an individual" in the instruction was *not* referring to Rodriguez, who was the subject of the murder. He argued that

there was no evidence that defendant intended to kill Lozano and, thus, that there was reasonable doubt for the attempted-murder charge. In addition, in this case, the instructions themselves were also clear, collectively, because while the attempted-murder instruction referenced "an individual," the murder instruction specified it pertained to Rodriguez. And, prior to trial, the court informed the prospective jurors that defendant was charged with murder as to Rodriguez, but attempted murder as to Lozano. Again, here, two people were shot: one died, one was injured. Given the facts of the case, the instructions, and the additional comments made to the jury by the court and attorneys, we disagree that there was any serious risk the jury was confused or did not understand that the attempted-murder instruction required it to find defendant intended to kill Lozano, as opposed to Rodriguez.

¶ 57    Moreover, as explained earlier, we rejected a virtually identical argument in Joshua's appeal, where we determined that the pattern attempted-murder instruction used here did not warrant modification to conform to unusual facts or new law, there was no serious risk that the jury instruction misled the jury, and the instruction was properly presented to the jury. *Cavazos*, 2015 IL App (2d) 120171, ¶¶ 79-82. As such, where the same facts are at issue here, we have rejected defendant's claim that the record was devoid of sufficient evidence to sustain his attempted-murder conviction, and the attempted-murder instruction at issue is the same that we found appropriate in Joshua's case, the failure of trial, appellate, or postconviction counsel to raise the argument was not objectively unreasonable, nor did it create a reasonable probability that, had counsel raised the issue, it would have been successful such that the result of the proceeding would have been different.

¶ 58                                    III. CONCLUSION

¶ 59    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 60   Affirmed.